**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**MIAMI DIVISION**

**Case No.: _____**

GOVERNMENT EMPLOYEES INSURANCE
CO., GEICO INDEMNITY CO., GEICO
GENERAL INSURANCE COMPANY and
GEICO CASUALTY CO.,

       Plaintiffs,

vs.

ALL STAR HEALTH CARE CORP., THE
MERGER CORP., LUXEN CARE INC.,
NIELS MOLEIRO, GLEN ALAN HERMAN,
M.D., NIRMAL JOSEPH, M.D., JORGE L.
JORGE, M.D., MAZEL MEDICAL CENTER
INC, LUIS DELGADO, ADRIAN DIAZ, and
GREGORIO B. ZUAZU, M.D.,

       Defendants.

**Jury Trial Demand**

_____/

## COMPLAINT

Plaintiffs, Government Employees Insurance Co., GEICO Indemnity Co., GEICO General

Insurance Company, and GEICO Casualty Co. (collectively, "GEICO" or "Plaintiffs"), sue

Defendants and allege as follows:

1.     This action seeks to recover more than $3,985,000.00 that Defendants wrongfully

obtained from GEICO by submitting thousands of fraudulent and unlawful no-fault ("no-fault",

"personal injury protection", or "PIP") insurance charges through Defendants All Star Health Care

Corp. ("All Star"), The Merger Corp ("Merger"), Luxen Care Inc. ("Luxen"), and Mazel Medical

Center Inc ("Mazel Medical") relating to medically unnecessary, illusory, unlawful, and otherwise

non-reimbursable health care services and goods, including initial examinations, follow-up examinations, chiropractic services, physical therapy services, diagnostic imaging services, and "extracorporeal shockwave therapy" ("ESWT") (collectively the "Fraudulent Services"), that purportedly were provided to Florida automobile accident victims ("Insureds") who were eligible for coverage under GEICO PIP insurance policies.

2.      In addition, GEICO seeks a declaration that it is not legally obligated to pay reimbursement of more than $75,000.00 in pending, fraudulent, and unlawful PIP claims that Defendants have submitted through All Star, Merger, Luxen, and Mazel Medical because:

(i)      at all relevant times, Defendants operated in violation of Florida law, including Florida's Health Care Clinic Act, Fla. Stat. § 400.990 et seq. (the "Clinic Act"), Florida's False and Fraudulent Insurance Claims State, Fla. Stat. § 817.234(7) (the "False and Fraudulent Insurance Claims Statute"), Florida's Physical Therapy Practice Act, Fla. Stat. § 486.011-486.172 ("the Physical Therapy Act"), Florida's Patient Brokering Act, Fla. Stat. § 817.505 (the "Patient Brokering Act"), and Florida's Anti-Kickback Statute, Fla. Stat. § 456.054 (the "Anti-Kickback Statute");

(ii)     the underlying Fraudulent Services were not medically necessary, and were provided – to the extent that they were provided at all – pursuant to pre-determined fraudulent protocols designed to financially enrich Defendants, rather than to treat or otherwise benefit the Insured who purportedly were subjected to them;

(iii)    in many cases, the Fraudulent Services at All Star, Merger, and Luxen were performed – to the extent that they were performed at all – by massage therapists, and Florida law prohibits PIP insurance reimbursement for massage or for services provided by massage therapists;

(iv)     in many cases, the Fraudulent Services at All Star, Merger, and Luxen were not reimbursable as a matter of Florida law, because they were performed – to the extent that they were performed at all – by individuals who lacked the requisite licenses necessary to perform the services;

(v)      in many cases, the billing submitted through All Star, Merger, Luxen, and Merger Medical misrepresented the identities of the individuals who performed or directly supervised the Fraudulent Services, and was submitted in violation of the billing requirements set forth in the Florida Motor Vehicle No-Fault Law, Fla. Stat. §§ 627.730-627.7405 (the "No-Fault Law");

(vi)     in many cases, the Fraudulent Services never were provided in the first instance; and

(vii)    Defendants' billing for the Fraudulent Services misrepresented and exaggerated the nature, extent, medical necessity, and results of the Fraudulent Services, as well as Defendants compliance with Florida law and eligibility to obtain PIP reimbursement in the first place.

3.       As set forth below, Defendants at all relevant times have known that:

(i)      Defendants operated in violation of Florida law, including the Clinic Act, the False and Fraudulent Insurance Claims Statute, the Physical Therapy Act, the Patient Brokering Act, and the Anti-Kickback Statute, and therefore were ineligible for PIP reimbursement;

(ii)     the underlying Fraudulent Services were not medically necessary, and were provided – to the extent provided at all – pursuant to pre-determined fraudulent protocols designed to financially enrich the Defendants, rather than to treat or otherwise benefit the Insureds who purportedly received the Fraudulent Services;

(iii)    in many cases, the Fraudulent Services at All Star, Merger, and Luxen were performed – to the extent that they were performed at all – by massage therapists, and therefore were ineligible for PIP reimbursement;

(iv)     in many cases, the Fraudulent Services at All Star, Merger, and Luxen were performed – to the extent that they were performed at all – by individuals who lacked the requisite licenses necessary to perform the services, and therefore were ineligible for PIP reimbursement;

(v)      in many cases, the billing submitted through All Star, Merger, Luxen, and Mazel Medical misrepresented the identities of the individuals who performed or directly supervised the Fraudulent Services, and was submitted in violation of the billing requirements set forth in the No-Fault Law, rendering the charges ineligible for PIP reimbursement;

(vi)     in many cases, the Fraudulent Services never were provided in the first instance; and

(viii)   Defendants' billing for the Fraudulent Services misrepresented and exaggerated the nature, extent, medical necessity, and results of the Fraudulent Services, as well as Defendants compliance with Florida law and eligibility to obtain PIP reimbursement in the first place.

4.      As such, Defendants do not now have – and never had – any right to be compensated for the Fraudulent Services that were billed to GEICO through All Star, Merger, Luxen, and Mazel Medical.

5.      The charts annexed hereto as Exhibits "1" – "4" set forth large, representative samples of the fraudulent and unlawful claims that have been identified to date that Defendants have submitted, or caused to be submitted, to GEICO via the mail.

6.      Defendants' fraudulent and unlawful scheme began no later than 2021, and has continued uninterrupted since that time. As a result of Defendants' fraudulent and unlawful scheme, GEICO has incurred damages of more than $3,985,000.00.

## THE PARTIES

### I.      Plaintiffs

7.      Plaintiffs Government Employees Insurance Co., GEICO Indemnity Co., GEICO General Insurance Company, and GEICO Casualty Co. are Nebraska corporations with their principal place in Chevy Chase, Maryland. GEICO is authorized to conduct business and to issue automobile insurance policies in Florida.

### II.      Defendants

8.      Defendant All Star is a Florida corporation with its principal place of business in Hialeah, Florida. All Star was incorporated in Florida on March 18, 2021, and was used as a vehicle to submit fraudulent and unlawful PIP insurance billing to GEICO and other insurers.

9.      Defendant Merger is a Florida corporation with its principal place of business in Miami, Florida. Merger was incorporated in Florida on February 1, 2016, and was used as a vehicle to submit fraudulent and unlawful PIP insurance billing to GEICO and other insurers.

10.     Defendant Luxen is a Florida corporation with its principal place of business in Doral, Florida. Luxen was incorporated in Florida on June 2, 2023, and was used as a vehicle to submit fraudulent and unlawful PIP insurance billing to GEICO and other insurers.

11.     Defendant Niels Moleiro ("Moleiro") resides in and is a citizen of Florida. Moleiro owned and controlled All Star from March 18, 2022 to the present; owned and controlled Merger from February 1, 2016 to the present; owned and controlled Luxen from June 2, 2023 to the present; and used All Star, Merger, and Luxen as vehicles to submit fraudulent and unlawful PIP insurance billing to GEICO and other insurers.

12.     Defendant Glen Alan Herman, M.D. ("Herman") resides in and is a citizen of Florida. Herman was licensed to practice medicine in Florida on April 24, 1989. Herman falsely purported to serve as a medical director at All Star from September 6, 2022 to the present; falsely purported to serve as a medical director at Merger from July 13, 2022 to the present; and falsely purported to serve as a medical director at Luxen from June 9, 2023 to the present.

13.     Defendant Nirmal Joseph, M.D. ("Joseph") resides in and is a citizen of Florida. Joseph was licensed to practice medicine in Florida on September 17, 2004. Joseph falsely purported to serve as a medical director at All Star from August 2, 2021 to September 5, 2022.

14.     Defendant Jorge L. Jorge, M.D. ("Jorge") resides in and is a citizen of Florida. Jorge was licensed to practice medicine in Florida on May 26, 2021. Jorge falsely purported to serve as a medical director at Merger from September 30, 2021 to June 30, 2022.

15.     Defendant Mazel Medical is a Florida corporation with its principal place of business in Miami, Florida. Mazel Medical was incorporated in Florida on January 26, 2018, and was used as a vehicle to submit fraudulent and unlawful PIP insurance billing to GEICO and other insurers.

5

16.     Defendant Luis Delgado ("Delgado") resides in and is a citizen of Florida. Delgado owned and controlled Mazel Medical from 2018 to 2022, and used Mazel Medical as a vehicle to submit fraudulent and unlawful PIP insurance billing to GEICO and other insurers.

17.     Defendant Adrian Diaz ("Diaz") resides in and is a citizen of Florida. Diaz owned and controlled Mazel Medical from 2022 to the present, and used Mazel Medical as a vehicle to submit fraudulent and unlawful PIP insurance billing to GEICO and other insurers.

18.     Defendant Gregorio B. Zuazu, M.D. ("Zuazu") resides in and is a citizen of Florida. Zuazu was licensed to practice medicine in Florida on November 6, 1981. Zuazu falsely purported to serve as the medical director at Mazel Medical from 2018 to the present, and purported to perform many of the Fraudulent Services on behalf of Mazel Medical.

### III.    Other Relevant Individuals

19.     Although GEICO has not named them as Defendants in this Complaint, Marianela Galvez Perez, A.P.R.N. ("Perez"), Yolanda Luisa Collada, A.P.R.N. ("Collada"), Yariana Martinez Sanchez, A.P.R.N. ("Sanchez"), Leticia Barrero Gonzalez, A.P.R.N. (L. Gonzalez"), Evelin Gonzalez Fernandez, A.P.R.N. (E. "Fernandez"), Armando Tomas Evora, A.P.R.N. ("Evora"), Bisleidy Gonzalez, A.P.R.N. ("B. Gonzalez"), Dayneris Martinez, A.P.R.N. ("Martinez"), Ramon Rodriguez Fernandez, A.P.R.N. ("R. Fernandez"), Yudelkis Acosta Hernandez, A.P.R.N. ("Hernandez"), Odania Bonilla, A.P.R.N. ("Bonilla"), Juana Izquierdo, A.P.R.N. ("Izquierdo"), Jacqueline Lopez Sierra, A.P.R.N. ("Sierra") (collectively the "Clinic Defendant Nurses") are also relevant to understanding Plaintiffs' claims in this action.

20.     Perez is a licensed advanced practice registered nurse, was employed by or associated with All Star and Merger, and purported to perform Fraudulent Services on behalf of All Star and Merger, at the direction of All Star, Merger, and Moleiro.

21.     Collada is a licensed advanced practice registered nurse, was employed by or associated with All Star, and purported to perform Fraudulent Services on behalf of All Star, at the direction of All Star and Moleiro.

22.     Sanchez is a licensed advanced practice registered nurse, was employed by or associated with All Star, Merger, and Luxen, and purported to perform Fraudulent Services on behalf of All Star, Merger, and Luxen, at the direction of All Star, Merger, Luxen, and Moleiro.

23.     L. Gonzalez is a licensed advanced practice registered nurse, was employed by or associated with All Star and Merger, and purported to perform Fraudulent Services on behalf of All Star and Merger, at the direction of All Star, Merger, and Moleiro.

24.     E. Fernandez is a licensed advanced practice registered nurse, was employed by or associated with All Star, and purported to perform Fraudulent Services on behalf of All Star, at the direction of All Star and Moleiro.

25.     Evora is a licensed advanced practice registered nurse, was employed by or associated with All Star, and purported to perform Fraudulent Services on behalf of All Star, at the direction of All Star and Moleiro.

26.     B. Gonzalez is a licensed advance practice registered nurse, was employed by or associated with All Star, and purported to perform Fraudulent Services on behalf of All Star, at the direction of All Star and Moleiro.

27.     Martinez is a licensed advanced practice registered nurse, was employed by or associated with All Star, and purported to perform Fraudulent Services on behalf of All Star, at the direction of All Star and Moleiro.

28.    R. Fernandez is a licensed advanced practice registered nurse, was employed by or associated with Merger, and purported to perform Fraudulent Services on behalf of Merger, at the direction of Merger and Moleiro.

29.    Hernandez is a licensed advanced practice registered nurse, was employed by or associated with Merger, and purported to perform Fraudulent Services on behalf of Merger, at the direction of Merger and Moleiro.

30.    Bonilla is a licensed advanced practice registered nurse, was employed by or associated with Merger, and purported to perform Fraudulent Services on behalf of Merger, at the direction of Merger and Moleiro.

31.    Izquierdo is a licensed advanced practice registered nurse, was employed by or associated with All Star and Merger, and purported to perform Fraudulent Services on behalf of All Star and Merger, at the direction of All Star, Merger and Moleiro.

32.    Sierra is a licensed advanced practice registered nurse, was employed by or associated with All Star, and purported to perform Fraudulent Services on behalf of All Star, at the direction of All Star and Moleiro.

33.    Joshua Rodriguez, D.C. ("Rodriguez"), Bianca Espinoza, D.C. ("Espinoza"), Hilda Paola Franco, D.C. ("Franco"), and Cristina Michelle Soto Mendez, D.C. ("Mendez") (collectively the "Clinic Defendant Chiropractors") also are relevant to understanding the claims and allegations in this Complaint.

34.    Rodriguez is a licensed chiropractor, was employed by or associated with All Star and Merger, and purported to perform Fraudulent Services on behalf of All Star and Merger, at the direction of All Star, Merger, and Moleiro.

35.     Espinoza is a licensed chiropractor, was employed by or associated with All Star and Merger, and purported to perform Fraudulent Services on behalf of All Star and Merger, at the direction of All Star, Merger, and Moleiro.

36.     Franco is a licensed chiropractor, was employed by or associated with All Star and Merger, and purported to perform Fraudulent Services on behalf of All Star and Merger, at the direction of All Star, Merger, and Moleiro.

37.     Mendez is a licensed chiropractor, was employed by or associated with Merger, and purported to perform Fraudulent Services on behalf of Merger, at the direction of Merger and Moleiro.

## JURISDICTION AND VENUE

38.     The Court has jurisdiction over the subject matter of this action under 28 U.S.C. § 1332(a)(1) because the total matter in controversy, exclusive of interests and costs, exceeds the jurisdictional threshold of $75,000.00, and is between citizens of different states.

39.     This Court also has original jurisdiction pursuant to 28 U.S.C. § 1331 over claims brought under 18 U.S.C. § § 1961 et seq. (the Racketeer Influenced and Corrupt Organizations ("RICO") Act).

40.     In addition, this Court has supplemental jurisdiction over the subject matter of the claims asserted in this action pursuant to 28 U.S.C. § 1367.

41.     Venue in this District is appropriate pursuant to 28 U.S.C. § 1391, as the Southern District of Florida is the District where one or more of the Defendants reside and because this is the District where a substantial amount of the activities forming the basis of the Complaint occurred.

## ALLEGATIONS

**I.    An Overview of the Pertinent Law Governing No-Fault Insurance Reimbursement**

42.    Florida has a comprehensive statutory system designed to ensure that motor vehicle accident victims are compensated for their injuries. The statutory system is embodied within the No-Fault Law, which requires automobile insurers to provide Personal Injury Protection benefits ("PIP Benefits") to Insureds.

43.    Under the No-Fault Law, an Insured can assign their right to PIP Benefits to health care service providers in exchange for those services. Pursuant to a duly executed assignment, a health care services provider may submit claims directly to an insurance company in order to receive payment for medically necessary services, using the required claims forms including the Health Care Financing Administration insurance claim form (known as the "HCFA-1500 form").

44.    In order for a health care service to be eligible for PIP reimbursement, it must be "lawfully" provided.

45.    Pursuant to the No-Fault Law, "lawful" or "lawfully" means "in substantial compliance with all relevant applicable criminal, civil, and administrative requirements of state and federal law related to the provision of medical services or treatment."

46.    Thus, health care services providers, including clinics licensed under the Clinic Act, may not recover PIP Benefits for health care services that were not provided in substantial compliance with all relevant applicable criminal, civil, and administrative requirements of Florida and federal law related to the provision of the underlying services or treatment.

47.    Subject to certain limited exceptions that are not applicable in this case, the Clinic Act defines "clinic" to mean "an entity where health care services are provided to individuals and

which tenders charges for reimbursement for such services, including a mobile clinic and a portable equipment provider."

48.     Pursuant to the Clinic Act, every clinic operating in Florida must – among other things – be licensed by the Florida Agency for Health Care Administration ("AHCA"), and appoint a physician as medical director who must agree in writing to accept legal responsibility for certain enumerated activities on behalf of the clinic.

49.     Among other things, a clinic medical director must "[c]onduct systematic reviews of clinic billings to ensure that the billings are not fraudulent or unlawful. Upon discovery of an unlawful charge, the medical director or clinic direct shall take immediate corrective action."

50.     In addition, a clinic medical director must "[e]nsure that all practitioners providing health care services or supplies to patients maintain a current active and unencumbered Florida license," and "[e]nsure that all health care practitioners at the clinic have active appropriate certification or licensure for the level of care being provided."

51.     Moreover, a clinic medical director must "review any patient referral contracts or agreements executed by the clinic".

52.     What is more, pursuant to the Clinic Act, no clinic may operate in Florida without the legitimate day-to-day supervision of a physician medical director.

53.     Pursuant to the Clinic Act, "[a] charge or reimbursement claim made by or on behalf of a clinic that is required to be licensed under this party but that is not so licensed, or that is otherwise operating in violation of this part, regardless of whether a service is rendered or whether the charge or reimbursement claim is paid, is an unlawful charge and is noncompensable and unenforceable. A person who knowingly makes or causes to be made an unlawful charge commits theft within the meaning of, and punishable as provided in, [Fla. Stat. §] 812.014."

54.     Thus, pursuant to both the No-Fault Law and the Clinic Act, clinics that operate in violation of the Clinic Act's medical director or other operating requirements are not entitled to collect PIP Benefits, whether or not the underlying health care services were medically necessary or actually provided.

55.     Under the False and Fraudulent Insurance Claims statute, it is unlawful for a health care provider to engage in the general business practice of waiving, or failing to make a good-faith effort to collect, co-payments or deductibles from patients with PIP insurance.

56.     Failure to make a good-faith effort to collect co-payments or deductibles renders the charges submitted by a health care provider unlawful and noncompensable, whether or not the underlying health care services were medically necessary or actually provided.

57.     Florida's Patient Brokering Act, Fla. Stat. § 817.505, broadly prohibits any person from offering, paying, soliciting, or receiving any commission, bonus, rebate, kickback, or bribe – directly or indirectly, in cash or in kind – or from engaging in any fee-splitting arrangement of any type whatsoever, to either induce a patient referral or in exchange for a patient referral.

58.     Likewise, Florida's Anti-Kickback Statute prohibits any health care provider from offering, paying, soliciting, or receiving a kickback, directly or indirectly, overtly or covertly, in cash or in kind, for referring or soliciting patients. Violations of the Anti-Kickback Statute also constitute violations of the Patient Brokering Act.

59.     Insurers such as GEICO are not required to make any payments of PIP Benefits to clinics and other health care providers that operate in violation of the Patient Brokering Act or Anti-Kickback Statute, whether or not the underlying health care services were medically necessary or actually provided.

60.     Pursuant to the No-Fault Law, insurers such as GEICO are only required to pay PIP Benefits for "medically necessary" services. At the same time, a health care services provider, including a clinic organized under the Clinic Act, is only eligible to receive PIP Benefits for medically necessary services.

61.     Pursuant to the No-Fault Law, "medically necessary" means:

a medical service or supply that a prudent physician would provide for the purpose of preventing, diagnosing, or treating an illness, injury, disease, or symptom in a manner that is:

(a) In accordance with generally accepted standards of medical practice;

(b) Clinically appropriate in terms of type, frequency, extent, site, and duration; and

(c) Not primarily for the convenience of the patient, physician, or other health care provider.

62.     Prior to January 1, 2013, the No-Fault Law permitted health care services providers, including clinics licensed under the Clinic Act, to collect PIP Benefits for massage therapy and for services performed by massage therapists.

63.     However, the No-Fault Law was amended, effective January 1, 2013, to prohibit PIP reimbursement for massage or for any other services performed by massage therapists.

64.     Pursuant to the Physical Therapy Act: (i) massage therapists may not practice physical therapy, or hold themselves out as being able to practice physical therapy, unless they have an actual license to practice physical therapy, as opposed to massage therapy; and (ii) unlicensed and unsupervised individuals may not practice physical therapy, or hold themselves out as being able to practice physical therapy.

65.     Pursuant to the Physical Therapy Act and the No-Fault Law, insurers such as GEICO are not required to pay for physical therapy services performed by massage therapists, or

for physical therapy services that are unlawfully performed by unlicensed and unsupervised individuals.

66.     Pursuant to the No-Fault Law, insurers such as GEICO also are not required to pay PIP Benefits:

(i)     For any service or treatment that is "upcoded," meaning that it is billed using a billing code that would result in payment greater in amount than would be paid using a billing code that accurately describes the services performed;

(ii)    To any person who knowingly submits a false or misleading statement relating to the claim or charges; or

(iii)   With respect to a bill or statement that does not substantially meet the billing requirements set forth in the No-Fault Law.

67.     The No-Fault Law's billing requirements provide that all PIP billing must, to the extent applicable, comply with the instructions promulgated by the Centers for Medicare & Medicaid Services ("CMS") for the completion of HCFA-1500 forms, as well as the guidelines promulgated by the American Medical Association ("AMA") in connection with the use of current procedural terminology ("CPT") codes.

68.     The instructions promulgated by CMS for the completion of HCFA-1500 forms require, among other things, that all HCFA-1500 forms set forth, in Box 31, the identity of the individual health care practitioner who personally performed or directly supervised the underlying health care services.

69.     To "directly supervise" a service, a health care practitioner "must be present in the office suite and immediately available to furnish assistance and direction throughout the performance of the procedure. It does not mean that the physician must be present in the room when the procedure is performed." See, e.g., Medicare Claims Processing Manual, Chapter 26 – Completing and Processing Form CMS-1500 Data Set.

70.     Insurers are not required to pay PIP Benefits to health care providers that misrepresent, in their billing, the identity of the individual health care practitioners who performed or directly supervised the underlying services.

## II.     Defendants' Interrelated Fraudulent Schemes

71.     Since at least 2021, and continuing through the present day, Defendants conceived and implemented interrelated fraudulent schemes in which they billed GEICO and other Florida automobile insurers millions of dollars for medically unnecessary, illusory, unlawful, and otherwise non-reimbursable services.

### A.     Defendants' Violations of the Clinic Act

72.     Because All Star, Merger, Luxen, Mazel Medical were subject to the Clinic Act, Moleiro could not lawfully operate All Star, Merger, and Luxen, and Delgado and Diaz could not lawfully operate Mazel Medical, unless they obtained clinic licenses for the respective clinics, and unless the clinics employed licensed physicians as their respective medical directors, who actually performed the required duties of clinic medical directors.

73.     However, if Moleiro, Delgado, and Diaz retained legitimate physicians to serve as the All Star, Merger, Luxen, and Mazel Medical's respective medical directors, any such legitimate physicians actually would be obligated to fulfill the statutory requirements applicable to clinic medical directors, which would impede the Defendants' interrelated fraudulent schemes.

74.     Accordingly:

(i)     Moleiro recruited Herman, a licensed physician, who was willing to falsely pose as the legitimate medical director at All Star, Merger, and Luxen but who – in actuality – would not even attempt to fulfill the statutory requirements applicable to a clinic medical director at the clinic;

(ii)     Moleiro also recruited Joseph, a licensed physician, who was willing to falsely pose as the legitimate medical director at All Star but who – in actuality – would not

15

even attempt to fulfill the statutory requirements applicable to a clinic medical director at the clinic;

(iii)    Moleiro also recruited Jorge, a licensed physician, who was willing to falsely pose as the legitimate medical director at Merger but who – in actuality – would not even attempt to fulfill the statutory requirements applicable to a clinic medical director at the clinic; and

(iv)    Delgado and Diaz recruited Zuazu, a licensed physician, who was willing to falsely pose as the legitimate medical director at Mazel Medical, but who – in actuality – would not even attempt to fulfill the statutory requirements applicable to clinic medical directors at the clinics.

75.    Herman, Joseph, Jorge, and Zuazu never were genuine medical directors for All Star, Merger, Luxen, or Mazel Medical, respectively.

76.    Instead, from the beginning of Herman, Joseph, and Jorge's association with All Star, Merger, and Luxen, respectively, they ceded all day-to-day decision-making and oversight regarding health care services at the clinics to Moleiro.

77.    Likewise, from the beginning of Zuazu's association with Mazel Medical, he ceded all day-to-day decision-making and oversight regarding health care services at the clinic to Delgado and Diaz.

78.    In keeping with the fact that Herman, Joseph, Jorge, and Zuazu were never genuine medical directors for the All Star, Merger, Luxen, and Mazel Medical, respectively, Herman, Joseph, Jorge, and Zuazu never legitimately conducted systematic reviews of All Star, Merger, Luxen, and Mazel Medical's billings to ensure that the billings were not fraudulent or unlawful, and instead permitted All Star, Merger, Luxen, and Mazel Medical to operate in the fraudulent and unlawful manner described herein.

79.    What is more, though no Florida health care clinic may operate without the day-to-day supervision of a physician medical director, Herman, Joseph, Jorge, and Zuazu never provided

16

legitimate, day-to-day supervision at All Star, Merger, Luxen, and Mazel Medical, respectively, and in fact only occasionally was present at the respective clinics, if at all.

80.     For instance, All Star's September 2022, August 2023, and October 2023 clinic licensing applications represented that Herman was only present at All Star "[a]t least once a month as needed."

81.     Likewise, Merger's July 2022 and December 2022 clinic licensing applications represented that Herman was only present at Merger "[a]t least once a month as needed."

82.     What is more, All Star's August 2021 clinic licensing application represented that Joseph was only present at All Star "[a]t least once a month as needed."

83.     Furthermore, Merger's June 2022 clinic licensing application represented that Jorge was only present at Merger "[a]t least once a month as needed."

84.     Moreover, Luxen's August 2023 clinic licensing application represented that Herman was only present at Luxen "[a]t least once a month as needed."

85.     In addition, though Zuazu purported to be the "medical director" at Mazel Medical, he could not have been regularly present at Mazel Medical to provide legitimate, day-to-day supervision, considering that – at the same time when he was purporting to serve as medical director for Mazel Medical – Zuazu, who was in his late 70s at the time, also was purporting to serve as medical director at multiple other clinics, and was purporting to personally perform or directly supervise large numbers of health care services at locations throughout Florida.

86.     In the claims identified in Exhibits "1" – "4", Defendants falsely represented that All Star, Merger, Luxen, and Mazel Medical were in compliance with the Clinic Act and eligible to receive PIP reimbursement.

87.     In fact, All Star, Merger, Luxen, and Mazel Medical were not in compliance with the Clinic Act, and were not eligible to receive PIP reimbursement.

**B.      The Unlawful Billing for Services Performed by Massage Therapists and Unlicensed/Unsupervised Individuals at All Star, Merger, and Luxen, and Misrepresentations Regarding the Identities of Actual Treating Practitioners**

88.     All Star, Merger, Luxen, Moleiro, Herman, Joseph, and Jorge billed for a limited range of health care goods and services through All Star, Merger, and Luxen, specifically: (i) purported initial examinations; (ii) purported follow-up examinations; and (iii) purported physical therapy services, including mechanical traction, electrical stimulation, ultrasound therapy, therapeutic exercises, manual therapy, and neuromuscular reeducation, among other modalities; (iv) purported chiropractic services; and (v) ESWT.

89.     As set forth in Exhibits "1" – "3", the purported physical therapy services constituted the substantial majority of the services that were billed through All Star, Merger, and Luxen to GEICO.

90.     In the claims identified in Exhibits "1" – "3", the purported physical therapy services were unlawfully performed – to the extent that they were performed at all – by unlicensed and unsupervised individuals, and by massage therapists including Idaliris Fernandez Blanco, L.M.T. ("Blanco"), Jannet Alberto Calzada, L.M.T. ("Calzada"), and Isabel Molina Valdez, L.M.T. ("Valdez").

91.     All Star, Merger, Luxen, Moleiro, Herman, Joseph, and Jorge were aware of the fact that they could not legally recover PIP Benefits for services performed by massage therapists or unlicensed individuals.

92.     As a result, and in order to conceal the fact that Blanco, Calzada, Valdez, and other massage therapists and unsupervised/unlicensed individuals performed the purported physical

therapy services that were unlawfully billed through All Star, Merger, and Luxen to GEICO, All

Star, Merger, Luxen, Moleiro, Herman, Joseph, and Jorge deliberately omitted any reference to

Blanco, Calzada, Valdez, and other massage therapists and unlicensed individuals associated with

All Star, Merger, and Luxen on the HCFA-1500 forms that they used to bill for the putative

physical therapy services.

93.     Instead, in the claims for physical therapy services identified in Exhibits "1" – "3",

All Star, Merger, Luxen, Moleiro, Herman, Joseph, and Jorge routinely and falsely listed Sanchez

on the HCFA-1500 forms as the supposed provider or direct supervisor of physical therapy

services.

94.     In fact, Sanchez, who was simultaneously purporting to work at numerous health

care practices at numerous locations, did not legitimately perform or directly supervise the physical

therapy services in the claims identified in Exhibits "1" – "3", and could not have legitimately

performed or directly supervised the physical therapy services.

95.     For example:

(i)     On November 27, 2023, Luxen, Moleiro, and Herman purported to provide at least
        18 individual physical therapy services to at least three individual Insureds, and
        falsely contended in the resulting bills to GEICO that Sanchez personally
        performed or at least directly supervised every one of those treatments. What is
        more, those putative treatments included at least 4.5 hours of physical therapy
        services that required direct, one-to-one patient contact between the treating
        provider and the Insureds throughout the services. That same day, Sanchez also
        purported to personally perform, or at least directly supervise: (a) at least three five-
        minute follow-up examinations that were performed on three GEICO Insureds at
        Luxen and at least 12 five-minute follow-up examinations and one 30-minute
        follow-up examination that were performed on 13 <u>additional</u> GEICO Insureds at
        Deluxe Care Corp, Superior Relief Therapy, and Merger; and (b) at least 77
        <u>additional</u> physical therapy services purportedly provided to at least 13 <u>additional</u>
        GEICO Insureds at Deluxe Care Corp, Superior Relief Therapy, and Merger,
        including at least 19.25 hours of physical therapy services that required direct, one-
        to-one contact between the treating provider and the Insureds throughout the
        services. In all, GEICO received billing for at least 25.5 hours of services that

Sanchez purported to personally perform, or at least directly supervise, at multiple different locations on November 27, 2023.

(ii)     On December 7, 2023, Luxen, Moleiro, and Herman purported to provide at least 39 individual physical therapy services to at least three individual Insureds, and falsely contended in the resulting bills to GEICO that Sanchez personally performed or at least directly supervised every one of those treatments. What is more, those putative treatments included at least 9.75 hours of physical therapy services that required direct, one-to-one patient contact between the treating provider and the Insureds throughout the services. That same day, Sanchez also purported to personally perform, or at least directly supervise: (a) at least two five-minute follow-up examinations and three 45-minute initial examinations that were performed on four GEICO Insureds at Luxen and at least 11 five-minute follow-up examinations and two 45-minute initial examination that were performed on 13 <u>additional</u> GEICO Insureds at Deluxe Care Corp, Superior Relief Therapy, and Merger; and (b) at least 83 <u>additional</u> physical therapy services purportedly provided to at least 13 <u>additional</u> GEICO Insureds at Deluxe Care Corp, Superior Relief Therapy, and Merger, including at least 20.75 hours of physical therapy services that required direct, one-to-one contact between the treating provider and the Insureds throughout the services. In all, GEICO received billing for at least 35 hours of services that Sanchez purported to personally perform, or at least directly supervise, at multiple different locations on December 7, 2023.

(iii)    On December 12, 2023, Merger, Moleiro, and Herman purported to provide at least 12 individual physical therapy services to at least two individual Insureds, and falsely contended in the resulting bills to GEICO that Sanchez personally performed or at least directly supervised every one of those treatments. What is more, those putative treatments included at least three hours of physical therapy services that required direct, one-to-one patient contact between the treating provider and the Insureds throughout the services. That same day, Sanchez also purported to personally perform, or at least directly supervise: (a) at least two five-minute follow-up examinations that were performed on two GEICO Insureds at Merger and at least 14 five-minute follow-up examinations that were performed on 14 <u>additional</u> GEICO Insureds at Deluxe Care Corp, Luxen, and Superior Relief Therapy; and (b) at least 89 <u>additional</u> physical therapy services purportedly provided to at least 15 <u>additional</u> GEICO Insureds at Deluxe Care Corp, Luxen, and Superior Relief Therapy, including at least 22.25 hours of physical therapy services that required direct, one-to-one contact between the treating provider and the Insureds throughout the services. In all, GEICO received billing for at least 26.5 hours of services that Sanchez purported to personally perform, or at least directly supervise, at multiple different locations on December 12, 2023.

(iv)    On December 21, 2023, All Star, Moleiro, and Herman purported to provide at least five individual physical therapy services to at least one individual Insured, and falsely contended in the resulting bills to GEICO that Sanchez personally performed or at least directly supervised every one of those treatments. What is

more, those putative treatments included at least 1.25 hours of physical therapy services that required direct, one-to-one patient contact between the treating provider and the Insureds throughout the services. That same day, Sanchez also purported to personally perform, or at least directly supervise: (a) at least 14 five-minute follow-up examinations and one 30-minute follow-up examination that were performed on 15 additional GEICO Insureds at Deluxe Care Corp, Merger, Luxen, and Superior Relief Therapy; and (b) at least 87 additional physical therapy services purportedly provided to at least 15 additional GEICO Insureds at Deluxe Care Corp, Luxen, Merger, and Superior Relief Therapy, including at least 21.75 hours of physical therapy services that required direct, one-to-one contact between the treating provider and the Insureds throughout the services. In all, GEICO received billing for at least 24.5 hours of services that Sanchez purported to personally perform, or at least directly supervise, at multiple different locations on December 21, 2023.

(v)     On January 4, 2024, Merger, Moleiro, and Herman purported to provide at least 37 individual physical therapy services to at least seven individual Insureds, and falsely contended in the resulting bills to GEICO that Sanchez personally performed or at least directly supervised every one of those treatments. What is more, those putative treatments included at least 9.25 hours of physical therapy services that required direct, one-to-one patient contact between the treating provider and the Insureds throughout the services. That same day, Sanchez also purported to personally perform, or at least directly supervise: (a) at least one 45-minute initial examination, five five-minute follow-up examinations, and two 30-minute follow-up examinations that were performed on seven GEICO Insureds at Merger; and two 45-minute initial examination, ten five-minute follow-up examination, one 20-minute follow-up examination, and one 30-minute follow-up examination that were performed on at least 14 additional GEICO Insureds at Deluxe Care Corp, Luxen, and Superior Relief Therapy; and (b) at least 98 additional physical therapy services purportedly provided to at least 15 additional GEICO Insureds at Deluxe Care Corp, Luxen, All Star, and Superior Relief Therapy, including at least 24.5 hours of physical therapy services that required direct, one-to-one contact between the treating provider and the Insureds throughout the services. In all, GEICO received billing for at least 38.25 hours of services that Sanchez purported to personally perform, or at least directly supervise, at multiple different locations on January 4, 2024.

(vi)    On January 10, 2024, Luxen, Moleiro, and Herman purported to provide at least 42 individual physical therapy services to at least six individual Insureds, and falsely contended in the resulting bills to GEICO that Sanchez personally performed or at least directly supervised every one of those treatments. What is more, those putative treatments included at least 10.5 hours of physical therapy services that required direct, one-to-one patient contact between the treating provider and the Insureds throughout the services. That same day, Sanchez also purported to personally perform, or at least directly supervise: (a) at least five five-minute follow-up examinations that were performed on five GEICO Insureds at Luxen and at least

nine five-minute follow-up examinations and two 20-minute follow-up examinations that were performed on at least ten <u>additional</u> GEICO Insureds at Deluxe Care Corp and Superior Relief Therapy; and (b) at least 66 <u>additional</u> physical therapy services purportedly provided to at least ten <u>additional</u> GEICO Insureds at Deluxe Care Corp and Superior Relief Therapy, including at least 16.5 hours of physical therapy services that required direct, one-to-one contact between the treating provider and the Insureds throughout the services. In all, GEICO received billing for at least 28.5 hours of services that Sanchez purported to personally perform, or at least directly supervise, at multiple different locations on January 10, 2024.

(vii)     On January 26, 2024, All Star, Moleiro, and Herman purported to provide at least five individual physical therapy services to at least one individual Insured, and falsely contended in the resulting bills to GEICO that Sanchez personally performed or at least directly supervised every one of those treatments. What is more, those putative treatments included at least 1.25 hours of physical therapy services that required direct, one-to-one patient contact between the treating provider and the Insureds throughout the services. That same day, Sanchez also purported to personally perform, or at least directly supervise: (a) at least 11 five-minute follow-up examinations and one 40-minute follow-up examination that were performed on 12 <u>additional</u> GEICO Insureds at Luxen and Superior Relief Therapy; and (b) at least 72 <u>additional</u> physical therapy services purportedly provided to at least 12 <u>additional</u> GEICO Insureds at Luxen and Superior Relief Therapy, including at least 18 hours of physical therapy services that required direct, one-to-one contact between the treating provider and the Insureds throughout the services. In all, GEICO received billing for at least 20.5 hours of services that Sanchez purported to personally perform, or at least directly supervise, at multiple different locations on January 26, 2024.

(viii)    On February 2, 2024, All Star, Moleiro, and Herman purported to provide at least five individual physical therapy services to at least one individual Insured, and falsely contended in the resulting bills to GEICO that Sanchez personally performed or at least directly supervised every one of those treatments. What is more, those putative treatments included at least 1.25 hours of physical therapy services that required direct, one-to-one patient contact between the treating provider and the Insureds throughout the services. That same day, Sanchez also purported to personally perform, or at least directly supervise: (a) at least one 45-minute initial examination, seven five-minute follow-up examinations, and one 30-minute follow-up examination that were performed on nine <u>additional</u> GEICO Insureds at Deluxe Care Corp, Luxen, and Superior Relief Therapy; and (b) at least 56 <u>additional</u> physical therapy services purportedly provided to at least nine <u>additional</u> GEICO Insureds at Deluxe Care Corp, Luxen, and Superior Relief Therapy, including at least 14 hours of physical therapy services that required direct, one-to-one contact between the treating provider and the Insureds throughout the services. In all, GEICO received billing for at least 17 hours of

services that Sanchez purported to personally perform, or at least directly supervise, at multiple different locations on February 2, 2024.

(ix)     On February 6, 2024, Merger, Moleiro, and Herman purported to provide at least 15 individual physical therapy services to at least three individual insureds, and falsely contended in the resulting bills to GEICO that Sanchez personally performed or at least directly supervised every one of those treatments. What is more, those putative treatments included at least 3.75 hours of physical therapy services that required direct, one-to-one patient contact between the treating provider and the Insureds throughout the services. That same day, Sanchez also purported to personally perform, or at least directly supervise: (a) at least three five-minute follow-up examinations that were performed on three GEICO Insureds at Merger and at least three 45-minute initial examinations, nine five-minute follow-up examinations, and one 30-minute follow-up examination that were performed on at least 13 additional GEICO Insureds at Deluxe Care Corp, Nexus Care, Luxen, and Superior Relief Therapy; and (b) at least 86 additional physical therapy services purportedly provided to at least 13 additional GEICO Insureds at Deluxe Care Corp, Luxen, and Superior Relief Therapy, including at least 21.5 hours of physical therapy services that required direct, one-to-one contact between the treating provider and the Insureds throughout the services. In all, GEICO received billing for at least 29 hours of services that Sanchez purported to personally perform, or at least directly supervise, at multiple different locations on February 6, 2024.

(x)      On February 15, 2024, Luxen, Moleiro, and Herman purported to provide at least 34 individual physical therapy services to at least five individual Insureds, and falsely contended in the resulting bills to GEICO that Sanchez personally performed or at least directly supervised every one of those treatments. What is more, those putative treatments included at least 8.5 hours of physical therapy services that required direct, one-to-one patient contact between the treating provider and the Insureds throughout the services. That same day, Sanchez also purported to personally perform, or at least directly supervise: (a) at least two 45-minute initial examinations, two five-minute follow-up examinations, and one 30-minute follow-up examination that were performed on five GEICO Insureds at Luxen and at least 11 five-minute follow-up examinations that were performed on 11 additional GEICO Insureds at Deluxe Care Corp, Merger, and Superior Relief Therapy; and (b) at least 60 additional physical therapy services purportedly provided to at least 11 additional GEICO Insureds at Deluxe Care Corp, Luxen, and Superior Relief Therapy, including at least 15 hours of physical therapy services that required direct, one-to-one contact between the treating provider and the Insureds throughout the services. In all, GEICO received billing for at least 26.5 hours of services that Sanchez purported to personally perform, or at least directly supervise, at multiple different locations on February 15, 2024.

(xi)     On March 14, 2024, Merger, Moleiro, and Herman purported to provide at least 24 individual physical therapy services to at least four individual insureds, and falsely contended in the resulting bills to GEICO that Sanchez personally performed or at

least directly supervised every one of those treatments. What is more, those putative treatments included at least six hours of physical therapy services that required direct, one-to-one patient contact between the treating provider and the Insureds throughout the services. That same day, Sanchez also purported to personally perform, or at least directly supervise: (a) at least three five-minute follow-up examinations that were performed on three GEICO Insureds at Merger and at least one 45- minute initial examination, 14 five-minute follow-up examinations, and one 20-minute follow-up examination that were performed on 16 <u>additional</u> GEICO Insureds at Deluxe Care Corp, Luxen, and Superior Relief Therapy; and (b) at least 92 <u>additional</u> physical therapy services purportedly provided to at least 14 <u>additional</u> GEICO Insureds at Deluxe Care Corp, Luxen, and Superior Relief Therapy, including at least 23 hours of physical therapy services that required direct, one-to-one contact between the treating provider and the Insureds throughout the services. In all, GEICO received billing for at least 31.5 hours of services that Sanchez purported to personally perform, or at least directly supervise, at multiple different locations on March 14, 2024.

(xii)    On May 28, 2024, All Star, Moleiro, and Herman purported to provide at least four individual physical therapy services to at least one individual Insured, and falsely contended in the resulting bills to GEICO that Sanchez personally performed or at least directly supervised every one of those treatments. What is more, those putative treatments included at least one hour of physical therapy services that required direct, one-to-one patient contact between the treating provider and the Insureds throughout the services. That same day, Sanchez also purported to personally perform, or at least directly supervise: (a) at least 12 45-minute follow-up examinations, 10 five-minute follow-up examinations, and one 20-minute follow-up examination that were performed on 16 <u>additional</u> GEICO Insureds at Emotions Center Corp, Merger, Luxen, and Superior Relief Therapy; and (b) at least 126 <u>additional</u> physical therapy services purportedly provided to at least 18 <u>additional</u> GEICO Insureds at Deluxe Care Corp, Luxen, Merger, and Superior Relief Therapy, including at least 31.5 hours of physical therapy services that required direct, one-to-one contact between the treating provider and the Insureds throughout the services. In all, GEICO received billing for at least 42.5 hours of services that Sanchez purported to personally perform, or at least directly supervise, at multiple different locations on May 28, 2024.

(xiii)   On June 18, 2024, Merger, Moleiro, and Herman purported to provide at least 16 individual physical therapy services to at least four individual Insureds, and falsely contended in the resulting bills to GEICO that Sanchez personally performed or at least directly supervised every one of those treatments. What is more, those putative treatments included at least four hours of physical therapy services that required direct, one-to-one patient contact between the treating provider and the Insureds throughout the services. That same day, Sanchez also purported to personally perform, or at least directly supervise: (a) one 45-minute initial examination and three five-minute follow-up examinations that were performed on four GEICO Insureds at Merger and at least two 45-minute initial examinations, 14 five-minute

follow-up examinations, and two 30-minute follow-up examinations that were performed on at least 18 <u>additional</u> GEICO Insureds at Luxen and Nexus Care; and (b) at least 86 <u>additional</u> physical therapy services purportedly provided to at least 15 <u>additional</u> GEICO Insureds at Nexus Care, Luxen, and All Star, including at least 21.5 hours of physical therapy services that required direct, one-to-one contact between the treating provider and the Insureds throughout the services. In all, GEICO received billing for at least 30 hours of services that Sanchez purported to personally perform, or at least directly supervise, at multiple different locations on June 18, 2024.

(xiv)  On July 2, 2024, Luxen, Moleiro, and Herman purported to provide at least 14 individual physical therapy services to at least three individual Insureds, and falsely contended in the resulting bills to GEICO that Sanchez personally performed or at least directly supervised every one of those treatments. What is more, those putative treatments included at least 3.5 hours of physical therapy services that required direct, one-to-one patient contact between the treating provider and the Insureds throughout the services. That same day, Sanchez also purported to personally perform, or at least directly supervise: (a) at least three five-minute follow-up examinations that were performed on three GEICO Insureds at Luxen and at least three five-minute follow-up examinations, one 20-minute follow-up examination, and one 40-minute follow-up examination that were performed on five <u>additional</u> GEICO Insureds at Emotions Center Corp, Merger, Deluxe Care Corp, and Superior Relief Therapy; and (b) at least 69 <u>additional</u> physical therapy services purportedly provided to at least six <u>additional</u> GEICO Insureds at Deluxe Care Corp, Emotions Center Corp, Superior Relief Therapy, and Merger, including at least 17.25 hours of physical therapy services that required direct, one-to-one contact between the treating provider and the Insureds throughout the services. In all, GEICO received billing for at least 22.25 hours of services that Sanchez purported to personally perform, or at least directly supervise, at multiple different locations on July 2, 2024.

(xv)  On June 18, 2024, Merger, Moleiro, and Herman purported to provide at least 16 individual physical therapy services to at least four individual Insureds, and falsely contended in the resulting bills to GEICO that Sanchez personally performed or at least directly supervised every one of those treatments. What is more, those putative treatments included at least four hours of physical therapy services that required direct, one-to-one patient contact between the treating provider and the Insureds throughout the services. That same day, Sanchez also purported to personally perform, or at least directly supervise: (a) one 45-minute initial examination and three five-minute follow-up examinations on four GEICO Insureds at Merger and at least two 45-minute initial examinations, 14 five-minute follow-up examinations, and two 30-minute follow-up examinations that were performed on at least 18 <u>additional</u> GEICO Insureds at Luxen and Nexus Care; and (b) at least 86 <u>additional</u> physical therapy services purportedly provided to at least 15 <u>additional</u> GEICO Insureds at Nexus Care, Luxen, and All Star, including at least 21.5 hours of physical therapy services that required direct, one-to-one contact between the

treating provider and the Insureds throughout the services. In all, GEICO received billing for at least 30 hours of services that Sanchez purported to personally perform, or at least directly supervise, at multiple different locations on June 18, 2024.

96.     These are only representative examples. In the claims for physical therapy services that are identified in Exhibits "1" – "3", All Star, Merger, Luxen, Moleiro, Herman, Joseph, and Jorge routinely falsely represented that Sanchez had performed – or at least directly supervised – an impossible number of physical therapy services on individual dates, considering the amount of services she simultaneously was purporting to perform or directly supervise at other health care clinics on those same dates.

97.     It is impossible that Sanchez routinely performed or directly supervised such a high volume of services, typically at multiple locations, on individual dates.

98.     Furthermore, upon information and belief, the fraudulent billing for physical therapy services that All Star, Merger, Luxen, Moleiro, Herman, Joseph, and Jorge submitted through All Star, Merger, and Luxen to GEICO constituted only a fraction of the total fraudulent billing for physical therapy services that they submitted to all of the automobile insurers in the Florida automobile insurance market.

99.     GEICO is only one of the automobile insurance companies doing business in the Florida automobile insurance market.

100.     It is extremely improbable, to the point of impossibility, that All Star, Merger, Luxen, Moleiro, Herman, Joseph, and Jorge only submitted fraudulent billing to GEICO, and that they did not simultaneously bill other automobile insurers.

101.     Thus, upon information and belief, the impossible number of physical therapy services that Sanchez purported to directly supervise or provide to GEICO's Insureds at All Star, Merger, Luxen, and other clinics on individual dates of services, including the dates of service

26

identified above, constituted only a fraction of the total number of physical therapy services that Sanchez purported to perform or directly supervise on those same dates of service.

102.    In the claims for "physical therapy" services identified in Exhibits "1" – "3", All Star, Merger, Luxen, Moleiro, Herman, Joseph, and Jorge routinely falsely misrepresented that the physical therapy services were lawfully provided and reimbursable, when in fact they were neither lawfully provided nor reimbursable, because:

(i)     the purported physical therapy services were performed – to the extent that they were performed at all – by massage therapists and unsupervised/unlicensed individuals, in contravention of Florida law;

(ii)    All Star, Merger, and Luxen could not lawfully recover PIP Benefits for the purported physical therapy services, because they were performed by massage therapists and unsupervised/unlicensed individuals, and because they operated in violation of Florida law; and

(iii)   All Star, Merger, Luxen, Moleiro, Herman, Joseph, and Jorge fraudulently misrepresented and concealed the identities of the individuals who either personally performed or directly supervised the putative physical therapy services.

103.    In this context, Herman, Joseph, and Jorge – who purported to be the medical directors at All Star, Merger, and Luxen, respectively – did not, and could not have, legitimately performed his duties as medical directors.

104.    Had Herman, Joseph, and Jorge actually performed their duties as medical directors, they would have noted – among other things – that physical therapy services at All Star, Merger, and Luxen were unlawfully performed by massage therapists and unsupervised/unlicensed individuals, and unlawfully billed to GEICO.

**C.     Defendants' Unlawful General Business Practice of Failing to Make a Good Faith Effort to Collect Co-Payments and Deductibles from Their Patients**

105.    During the relevant time period, Defendants unlawfully engaged in the general business practice of waiving, or failing to make a good effort to collect, co-payments, or deductibles from their patients in violation of the False and Fraudulent Insurance Claims Statute.

106.    In keeping with this fact, in virtually all of the thousands of bills (i.e., the HCFA-1500 forms) submitted through All Star, Merger, Luxen, and Mazel Medical to GEICO for Defendants' Fraudulent Services, Defendants represented that they did not collect any money, whether it be a co-payment or deductible, from the patients.

107.    In the claims identified in Exhibits "1" – "4", Defendants routinely falsely represented that the underlying health care services were lawfully provided and reimbursable, when in fact they were neither lawfully provided nor reimbursable because the Defendants engaged in the unlawful general business practice of waiving, or failing to make a good-faith effort to collect, co-payments and deductibles from their patients in violation of the False and Fraudulent Insurance Claims Statute.

108.    In this context, Herman, Joseph, Jorge, and Zuazu – who purported to be the medical directors at All Star, Merger, Luxen, and Mazel Medical, respectively – did not, and could not have, legitimately systematically reviewed the All Star, Merger, Luxen, and Mazel Medical's billing to ensure that it was neither fraudulent nor unlawful.

109.    Had Herman, Joseph, Jorge, and Zuazu actually supervised the business activities of the respective All Star, Merger, Luxen, and Mazel Medical, respectively, they would have noted – among other things – that All Star, Merger, Luxen, and Mazel Medical unlawfully engaged in the general business practice of waiving, or failing to make a good-faith effort to collect, co-payments or deductibles from their patients in violation of the False and Fraudulent Claims Statute.

**D.**      **Defendants' Fraudulent Treatment and Billing Protocols**

110.      In the claims identified in Exhibits "1" – "4", almost none of the Insureds whom Defendants purported to treat suffered from any significant injuries or health problems as a result of the relatively minor accidents they experienced.

111.      Even so, in the claims identified in Exhibits "1" – "4", Defendants purported to subject virtually every Insured to a medically unnecessary course of "treatment" that was provided pursuant to a pre-determined, fraudulent protocol designed to maximize the billing that they could submit to insurers, including GEICO, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to the "treatment".

112.      Defendants purported to provide their pre-determined fraudulent treatment to Insureds in the claims identified in Exhibits "1" – "4" without regard for the Insureds' individual symptoms or presentation, or – in most cases – the total absence of any actual continuing medical problems arising from any actual automobile accidents.

113.      Each step in Defendants' fraudulent treatment protocols were designed to falsely reinforce the rationale for the previous step and provide a false justification for the subsequent step, and thereby permit Defendants to generate and falsely justify the maximum amount of fraudulent PIP billing for each Insured.

114.      No legitimate physician, physical therapist, nurse, clinic, or other health care provider would permit the fraudulent treatment and billing protocols described below to proceed under his, her, or its auspices.

115.      Defendants permitted the fraudulent treatment and billing protocols below to proceed under their auspices because they sought to continue profiting from the fraudulent billing they submitted to GEICO and other insurers.

1.     **The Fraudulent Charges for Initial Examinations at All Star, Merger, and Luxen**

116.    As an initial step in Defendants' fraudulent treatment and billing protocol, each of the Insureds in the claims identified in Exhibits "1" – "3" purportedly received an initial examination at All Star, Merger, and Luxen, respectively.

117.    In the claims identified in Exhibit "1", the substantial majority of initial examinations at All Star – which were typically purportedly performed by Collada, E. Fernandez, Perez, Sierra, Rodriguez, and Espinosa – were then billed by Moleiro, Herman, and Joseph through All Star to GEICO under CPT code 99203, typically resulting in charges of $250.00 for each putative examination.

118.    In the claims identified in Exhibit "2", the substantial majority of initial examinations at Merger – which were typically purportedly performed by Perez, Sanchez, and Gonzalez – were then billed by Moleiro, Herman, and Jorge through Merger to GEICO under CPT code 99204, typically resulting in charges of $450.00 for each initial examination that they purported to provide.

119.    In the claims identified in Exhibit "3", the substantial majority of initial examinations at Luxen – which were typically purportedly performed by Sanchez – were then billed by Moleiro and Herman through Luxen to GEICO under CPT code 99204, typically resulting in charges of $450.00 for each initial examination that they purported to provide.

120.    In fact, and as set forth herein, All Star, Merger, and Luxen never were eligible to collect PIP Benefits, inasmuch as they were operated in violation of Florida law.

121.    As set forth below, the charges for the initial examinations identified in Exhibits "1" – "3" also were fraudulent in that they misrepresented the nature, extent, and results of the initial examinations.

**(i)** **Misrepresentations Regarding the Severity of the Insureds' Presenting Problems During the Purported Initial Examinations**

122.     In the claims for initial examinations identified in Exhibits "1" – "3", All Star, Merger, Luxen, Moleiro, Herman, Joseph, and Jorge routinely misrepresented the severity of the Insureds' presenting problems.

123.     Pursuant to the American Medical Association's CPT Assistant, which governs reimbursement of PIP claims, the use of CPT code 99204 to bill for an initial examination typically requires that the Insured present with problems of moderate to high severity.

124.     Similarly, pursuant to the American Medical Association's CPT Assistant, the use of CPT code 99203 to bill for an initial examination typically requires that the Insured present with problems of moderate severity.

125.     However, to the extent that the Insureds in the claims identified in Exhibits "1" – "3" had any presenting problems at all as a result of their typically-minor automobile accidents, the problems virtually always were low or minimal severity soft tissue injuries such as sprains and strains.

126.     For instance, in most of the claims identified in Exhibits "1" – "3", the Insureds did not seek treatment at any hospital as a result of their accident, and to the limited extent that the Insureds in the claims identified in Exhibits "1" – "3" did seek treatment at a hospital following their accidents, they virtually always were briefly observed on an outpatient basis, and then discharged with nothing more serious than a minor soft tissue diagnosis.

127.     Furthermore, in most of the claims identified in Exhibits "1" – "3", contemporaneous police reports indicated that the Insureds' vehicle were functional following the accidents, and that no one was seriously injured in their accidents, or injured at all.

31

128.     Even so, in the claims for initial examinations identified in Exhibits "1" – "3", All Star, Merger, Luxen, Moleiro, Herman, Joseph, and Jorge routinely billed for their putative examinations using CPT codes 99204 and 99203, and thereby falsely represented that the Insureds presented with problems of moderate severity or moderate to high severity.

129.     For example:

(i)      On May 25, 2022, an Insured named SM was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that SM's vehicle was drivable following the accident. The police report further indicated that SM was not injured and did not complain of any pain at the scene. In keeping with the fact that SM was not seriously injured, SM did not visit any hospital emergency room following the accident. To the extent that SM experienced any health problems at all as a result of the accident, they were of low or minimal severity. Even so, following a purported initial examination of SM on May 31, 2022, Moleiro, Jorge, and Merger billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that the initial examination involved presenting problems of moderate severity.

(ii)     On June 20, 2022, an Insured named LJ was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that LJ's vehicle was drivable following the accident. The police report further indicated that LJ was not injured and did not complain of any pain at the scene. In keeping with the fact that LJ was not seriously injured, LJ did not visit any hospital emergency room following the accident. To the extent that LJ experienced any health problems at all as a result of the accident, they were of low or minimal severity. Even so, following a purported initial examination of LJ on June 24, 2022, Moleiro, Joseph, and All Star billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that the initial examination involved presenting problems of moderate severity.

(iii)    On August 5, 2022, an Insured named TS was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that TS's vehicle was drivable following the accident. The police report further indicated that TS was not injured and did not complain of any pain at the scene. In keeping with the fact that TS was not seriously injured, TS did not visit any hospital emergency room following the accident. To the extent that TS experienced any health problems at all as a result of the accident, they were of low or minimal severity. Even so, following a purported initial examination of TS on August 12, 2022, Moleiro, Joseph, and All Star billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that the initial examination involved presenting problems of moderate severity.

(iv)     On November 1, 2022, an Insured named RM was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that RM's vehicle was drivable following the accident. The police report further indicated that RM was not injured and did not complain of any pain at the scene. In keeping with the fact that RM was not seriously injured, RM did not visit any hospital emergency room following the accident. To the extent that RM experienced any health problems at all as a result of the accident, they were of low or minimal severity. Even so, following a purported initial examination of RM on November 1, 2022, Moleiro, Herman, and All Star billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that the initial examination involved presenting problems of moderate to high severity.

(v)      On December 2, 2022, an Insured named FF was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that FF's vehicle was drivable following the accident. The police report further indicated that FF was not injured and did not complain of any pain at the scene. In keeping with the fact that FF was not seriously injured, FF did not visit any hospital emergency room following the accident. To the extent that FF experienced any health problems at all as a result of the accident, they were of low or minimal severity. Even so, following a purported initial examination of FF on December 15, 2022, Moleiro, Herman, and Merger billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that the initial examination involved presenting problems of moderate to high severity.

(vi)     On February 15, 2023, an Insured named HC was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that HC's vehicle was drivable following the accident. The police report further indicated that HC was not injured and did not complain of any pain at the scene. In keeping with the fact that HC was not seriously injured, HC did not visit any hospital emergency room following the accident. To the extent that HC experienced any health problems at all as a result of the accident, they were of low or minimal severity. Even so, following a purported initial examination of HC on February 22, 2023, Moleiro, Herman, and All Star billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that the initial examination involved presenting problems of moderate severity.

(vii)    On July 14, 2023, an Insured named JH was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that JH's vehicle was drivable following the accident. The police report further indicated that JH was not injured and did not complain of any pain at the scene. In keeping with the fact that JH was not seriously injured, JH did not visit any hospital emergency room following the accident. To the extent that JH experienced any health problems at all as a result of the accident, they were of

33

low or minimal severity. Even so, following a purported initial examination of JH on July 27, 2023, Moleiro, Herman, and Merger billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that the initial examination involved presenting problems of moderate to high severity.

(viii)     On July 24, 2023, an Insured named JB was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that JB's vehicle was drivable following the accident. The police report further indicated that JB was not injured and did not complain of any pain at the scene. In keeping with the fact that JB was not seriously injured, JB did not visit any hospital emergency room following the accident. To the extent that JB experienced any health problems at all as a result of the accident, they were of low or minimal severity. Even so, following a purported initial examination of JB on July 31, 2023, Moleiro, Herman, and All Star billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that the initial examination involved presenting problems of moderate severity.

(ix)      On November 29, 2023, an Insured named EM was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that EM's vehicle was drivable following the accident. The police report further indicated that EM was not injured and did not complain of any pain at the scene. In keeping with the fact that EM was not seriously injured, EM did not visit any hospital emergency room following the accident. To the extent that EM experienced any health problems at all as a result of the accident, they were of low or minimal severity. Even so, following a purported initial examination of EM on December 1, 2023, Moleiro, Herman, and Luxen billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that the initial examination involved presenting problems of moderate to high severity.

(x)       On December 9, 2023, an Insured named MH was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that MH's vehicle was drivable following the accident. The police report further indicated that MH was not injured and did not complain of any pain at the scene. In keeping with the fact that MH was not seriously injured, MH did not visit any hospital emergency room following the accident. To the extent that MH experienced any health problems at all as a result of the accident, they were of low or minimal severity. Even so, following a purported initial examination of MH on December 13, 2023, Moleiro, Herman, and Luxen billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that the initial examination involved presenting problems of moderate to high severity.

(xi)      On December 17, 2023, an Insured named MM was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that MM's vehicle was drivable following the

accident. The police report further indicated that MM was not injured and did not complain of any pain at the scene. In keeping with the fact that MM was not seriously injured, MM did not visit any hospital emergency room following the accident. To the extent that MM experienced any health problems at all as a result of the accident, they were of low or minimal severity. Even so, following a purported initial examination of MM on December 22, 2023, Moleiro, Herman, and Merger billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that the initial examination involved presenting problems of moderate to high severity.

(xii)  On January 3, 2024, an Insured named YM was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that YM's vehicle was drivable following the accident. The police report further indicated that YM was not injured and did not complain of any pain at the scene. In keeping with the fact that YM was not seriously injured, YM did not visit any hospital emergency room following the accident. To the extent that YM experienced any health problems at all as a result of the accident, they were of low or minimal severity. Even so, following a purported initial examination of YM on January 4, 2024, Moleiro, Herman, and All Star billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that the initial examination involved presenting problems of moderate severity.

(xiii)  On February 21, 2024, an Insured named YE was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that YE's vehicle was drivable following the accident. The police report further indicated that YE was not injured and did not complain of any pain at the scene. In keeping with the fact that YE was not seriously injured, YE did not visit any hospital emergency room following the accident. To the extent that YE experienced any health problems at all as a result of the accident, they were of low or minimal severity. Even so, following a purported initial examination of YE on February 23, 2024, Moleiro, Herman, and Luxen billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that the initial examination involved presenting problems of moderate to high severity.

(xiv)  On May 23, 2024, an Insured named MS was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that MS's vehicle was drivable following the accident. The police report further indicated that MS was not injured and did not complain of any pain at the scene. In keeping with the fact that MS was not seriously injured, MS did not visit any hospital emergency room following the accident. To the extent that MS experienced any health problems at all as a result of the accident, they were of low or minimal severity. Even so, following a purported initial examination of MS on May 28, 2024, Moleiro, Herman, and Luxen billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that the initial examination involved presenting problems of moderate to high severity.

(xv)   On May 31, 2024, an Insured named JE was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that JE's vehicle was drivable following the accident. The police report further indicated that JE was not injured and did not complain of any pain at the scene. In keeping with the fact that JE was not seriously injured, JE did not visit any hospital emergency room following the accident. To the extent that JE experienced any health problems at all as a result of the accident, they were of low or minimal severity. Even so, following a purported initial examination of JE on June 13, 2024, Moleiro, Herman, and Luxen billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that the initial examination involved presenting problems of moderate to high severity.

130.   These are only representative examples. In the claims for initial examinations identified in Exhibits "1" – "3", All Star, Merger, Luxen, Moleiro, Herman, Joseph, and Jorge routinely falsely represented that the Insureds presented with problems of moderate severity or moderate to high severity in order to: (i) create a false basis for their charges for the examinations under CPT codes 99204 and 99203, because examinations billable under CPT codes 99204 and 99203 are reimbursable at higher rates than examinations involving presenting problems of low severity, minimal severity, or no severity; and (ii) create a false basis for the other Fraudulent Services that Defendants purported to provide the Insureds.

**(ii)   Misrepresentations Regarding the Amount of Time Spent on the Purported Initial Examinations**

131.   What is more, in the claims identified in Exhibits "1" – "3", the charges for the initial examinations under CPT codes 99204 and 99203 misrepresented and exaggerated the amount of time that the examining health care practitioner spent with the Insured or the Insureds' families.

132.   Pursuant to the CPT Assistant, the use of CPT code 99204 to bill for an initial patient examination represents that the physician or health care practitioner who performed the underlying examination spent at least 45 minutes performing the examination.

133.    Moreover, pursuant to the CPT Assistant, the use of CPT code 99203 to bill for a patient examination represents that the physician or other health care practitioner who performed the underlying examination spent at least 30 minutes performing the examinations.

134.    As set forth in Exhibits "1" – "3", All Star, Merger, Luxen, Moleiro, Herman, Joseph, and Jorge typically billed for their putative initial examinations using CPT codes 99204 and 99203, and thereby represented that the physicians and other health care practitioners who purported to conduct the examinations spent at least 30 to 45 minutes performing the examinations.

135.    In fact, in the initial examination examinations identified in Exhibits "1" – "3", Herman, the Clinic Defendant Nurses, and the Clinic Defendant Chiropractors who purported to perform the initial examinations on behalf of All Star, Merger, and Luxen, never spent more than 15-20 minutes when conduct the examinations, much less 30 to 45 minutes.

136.    In keeping with the fact that the initial examinations in the claims identified in Exhibits "1" – "3" did not involve more than 15-20 minutes of time to perform, the examining health care practitioners used pre-printed forms in purporting to conduct the examinations.

137.    All that was required to complete the pre-printed forms was a brief patient interview and a perfunctory physical examination of the Insureds, using a limited range of examination parameters.

138.    These interviews and examinations did not require the Clinic Defendant Nurses, Clinic Defendant Chiropractors, or any other examining health care practitioner associated with All Star, Merger, or Luxen to spend more than 15-20 minutes performing the putative initial examinations.

139.    In the claims for initial examinations that are identified in Exhibits "1" – "3", All Star, Merger, Luxen, Moleiro, Herman, Joseph, and Jorge routinely misrepresented the amount of

37

time that was spent in conducting the initial examinations because lengthier examinations that are billable under CPT codes 99204 and 99203 are reimbursable at higher rates than examinations that take less time to perform.

**(iii)     Misrepresentations Regarding the Extent of the Medical Decision-Making**

140.     Furthermore, and pursuant to the CPT Assistant, when All Star, Merger, Luxen, Moleiro, Herman, Joseph, and Jorge billed GEICO for putative initial examinations under CPT codes 99204 and 99203 in the claims for initial examinations identified in Exhibits "1" – "3", they falsely represented that the practitioners who purported to perform the examinations on behalf of All Star, Merger, and Luxen engaged in some legitimate, moderate complexity medical decision-making (when billed under CPT code 99204) or low complexity medical decision-making (when billed under CPT code 99203) in connection with the examinations.

141.     In actuality, the purported initial examinations did not involve any legitimate medical decision-making at all.

142.     Rather, in the claims for initial examinations identified in Exhibits "1" – "3": (i) the initial examinations did not involve the retrieval, review, or analysis of any meaningful amount of medical records, diagnostic tests, or other information; (ii) there was no risk of significant complications or morbidity – much less mortality – from the Insureds' minor soft-tissue injury complaints, to the extent that they ever had any complaints arising from automobile accidents at all; and (iii) the practitioners who purported to perform the examinations did not consider any significant number of diagnoses or treatment options for Insureds during the initial examinations, and instead provided a substantially similar set of pre-determined sprain/strain or similar soft tissue injury "diagnoses" for every Insured, regardless of their true individual circumstances or presentation.

143.    For example:

(i)     On March 17, 2022, an Insured named MP was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that MP's vehicle was drivable following the accident. The police report further indicated that MP was not injured and did not complain of any pain at the scene. In keeping with the fact that MP was not seriously injured, MP did not visit any hospital emergency room following the accident. On March 25, 2022, R. Fernandez purported to conduct an initial examination of MP at Merger. R. Fernandez did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, R. Fernandez did not consider any significant number of diagnoses or management options in connection with the examination. Instead, R. Fernandez provided MP with substantially the same false list of soft tissue injury "diagnoses" that he provided virtually every other Insured. Furthermore, neither MP's presenting problems, nor the treatment plan provided to MP by R. Fernandez, Jorge, Moleiro, and All Star presented any risk of significant complications, morbidity, or mortality. To the contrary, MP did not need any extensive treatment at all as a result of the accident, and the treatment plan provided by R. Fernandez, Joseph, Moleiro, and All Star consisted of medically unnecessary physical therapy treatment, which did not pose any risk to MP if properly administered.  Even so, Joseph, Moleiro, and All Star billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that R. Fernandez engaged in some legitimate, low complexity medical decision-making during the purported examination.

(ii)    On August 5, 2022, an Insured named TS was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that TS's vehicle was drivable following the accident. The police report further indicated that TS was not injured and did not complain of any pain at the scene. In keeping with the fact that TS was not seriously injured, TS did not visit any hospital emergency room following the accident. On August 12, 2022, Espinoza purported to conduct an initial examination of TS at All Star. Espinoza did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Espinoza did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Espinoza provided TS with substantially the same false list of soft tissue injury "diagnoses" that she provided virtually every other Insured. Furthermore, neither TS's presenting problems, nor the treatment plan provided to TS by Espinoza, Joseph, Moleiro, and All Star presented any risk of significant complications, morbidity, or mortality. To the contrary, TS did not need any extensive treatment at all as a result of the accident, and the treatment plan provided by Espinoza, Joseph, Moleiro, and All Star consisted of medically unnecessary physical therapy treatment, which did not pose any risk to TS if properly administered.  Even so, Joseph, Moleiro, and All Star billed GEICO for the initial examination using CPT code 99203, and thereby

falsely represented that Espinoza engaged in some legitimate, low complexity medical decision-making during the purported examination.

(iii)    On January 22, 2023, an Insured named MA was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that MA's vehicle was drivable following the accident. The police report further indicated that MA was not injured and did not complain of any pain at the scene. In keeping with the fact that MA was not seriously injured, MA did not visit any hospital emergency room following the accident. On February 3, 2023, Perez purported to conduct an initial examination of MA at All Star. Perez did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Perez did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Perez provided MA with substantially the same false list of soft tissue injury "diagnoses" that she provided virtually every other Insured. Furthermore, neither MA's presenting problems, nor the treatment plan provided to MA by Perez, Herman, Moleiro, and All Star presented any risk of significant complications, morbidity, or mortality. To the contrary, MA did not need any extensive treatment at all as a result of the accident, and the treatment plan provided by Perez, Herman, Moleiro, and All Star consisted of medically unnecessary physical therapy treatment, which did not pose any risk to MA if properly administered. Even so, Herman, Moleiro, and All Star billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that Perez engaged in some legitimate, low complexity medical decision-making during the purported examination.

(iv)    On July 14, 2023, an Insured named JH was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that JH's vehicle was drivable following the accident. The police report further indicated that JH was not injured and did not complain of any pain at the scene. In keeping with the fact that JH was not seriously injured, JH did not visit any hospital emergency room following the accident. To the extent that JH experienced any health problems at all as a result of the accident, they were of low or minimal severity. On July 27, 2023, Perez purported to conduct an initial examination of JH at Merger. Perez did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Perez did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Perez provided JH with substantially the same false list of soft tissue injury "diagnoses" that she provided virtually every other Insured. Furthermore, neither JH's presenting problems, nor the treatment plan provided to JH by Perez, Herman, Moleiro, and Merger presented any risk of significant complications, morbidity, or mortality. To the contrary, JH did not need any extensive treatment at all as a result of the accident, and the treatment plan provided by Perez, Herman, Moleiro, and Merger consisted of medically unnecessary physical therapy treatment, which did not pose any risk to JH if properly administered. Even so, Herman, Moleiro, and

Merger billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that Perez engaged in some legitimate, moderate complexity medical decision-making during the purported examination.

(v)      On September 6, 2023, an Insured named AA was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that AA's vehicle was drivable following the accident. The police report further indicated that AA was not injured and did not complain of any pain at the scene. In keeping with the fact that AA was not seriously injured, AA did not visit any hospital emergency room following the accident. On September 8, 2023, Sanchez purported to conduct an initial examination of AA at All Star. Sanchez did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Sanchez did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Sanchez provided AA with substantially the same false list of soft tissue injury "diagnoses" that she provided virtually every other Insured. Furthermore, neither AA's presenting problems, nor the treatment plan provided to AA by Sanchez, Herman, Moleiro, and All Star presented any risk of significant complications, morbidity, or mortality. To the contrary, AA did not need any extensive treatment at all as a result of the accident, and the treatment plan provided by Sanchez, Herman, Moleiro, and All Star consisted of medically unnecessary physical therapy treatment, which did not pose any risk to AA if properly administered.  Even so, Herman, Moleiro, and All Star billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that Sanchez engaged in some legitimate, low complexity medical decision-making during the purported examination.

(vi)     On October 25, 2023, an Insured named AC was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that AC's vehicle was drivable following the accident. The police report further indicated that AC was not injured and did not complain of any pain at the scene. In keeping with the fact that AC was not seriously injured, AC did not visit any hospital emergency room following the accident. On October 26, 2023, Sanchez purported to conduct an initial examination of AC at Luxen. Sanchez did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Sanchez did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Sanchez provided AC with substantially the same false list of soft tissue injury "diagnoses" that she provided virtually every other Insured. Furthermore, neither AC's presenting problems, nor the treatment plan provided to AC by Sanchez, Herman, Moleiro, and Luxen presented any risk of significant complications, morbidity, or mortality. To the contrary, AC did not need any extensive treatment at all as a result of the accident, and the treatment plan provided by Sanchez, Herman, Moleiro, and Luxen consisted of medically unnecessary physical therapy

treatment, which did not pose any risk to AC if properly administered.  Even so, Herman, Moleiro, and Luxen billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that Sanchez engaged in some legitimate, moderate complexity medical decision-making during the purported examination.

(vii)   On November 11, 2023, an Insured named YB was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that YB's vehicle was drivable following the accident. The police report further indicated that YB was not injured and did not complain of any pain at the scene. In keeping with the fact that YB was not seriously injured, YB did not visit any hospital emergency room following the accident. On November 21, 2023, Sanchez purported to conduct an initial examination of YB at Luxen. Sanchez did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Sanchez did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Sanchez provided YB with substantially the same false list of soft tissue injury "diagnoses" that she provided virtually every other Insured. Furthermore, neither YB's presenting problems, nor the treatment plan provided to YB by Sanchez, Herman, Moleiro, and Luxen presented any risk of significant complications, morbidity, or mortality. To the contrary, YB did not need any extensive treatment at all as a result of the accident, and the treatment plan provided by Sanchez, Herman, Moleiro, and Luxen consisted of medically unnecessary physical therapy treatment, which did not pose any risk to YB if properly administered.  Even so, Herman, Moleiro, and Luxen billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that Sanchez engaged in some legitimate, moderate complexity medical decision-making during the purported examination.

(viii)   On November 29, 2023, an Insured named EM was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that EM's vehicle was drivable following the accident. The police report further indicated that EM was not injured and did not complain of any pain at the scene. In keeping with the fact that EM was not seriously injured, EM did not visit any hospital emergency room following the accident. On December 1, 2023, Sanchez purported to conduct an initial examination of EM at Luxen. Sanchez did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Sanchez did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Sanchez provided EM with substantially the same false list of soft tissue injury "diagnoses" that she provided virtually every other Insured. Furthermore, neither EM's presenting problems, nor the treatment plan provided to EM by Sanchez, Herman, Moleiro, and Luxen presented any risk of significant complications, morbidity, or mortality. To the contrary, EM did not need any

extensive treatment at all as a result of the accident, and the treatment plan provided by Sanchez, Herman, Moleiro, and Luxen consted of medically unnecessary physical therapy treatment, which did not pose any risk to EM if properly administered. Even so, Herman, Moleiro, and Luxen billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that Sanchez engaged in some legitimate, moderate complexity medical decision-making during the purported examination.

(ix)    On December 4, 2023, an Insured named DR was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that DR's vehicle was drivable following the accident. The police report further indicated that DR was not injured and did not complain of any pain at the scene. In keeping with the fact that DR was not seriously injured, DR did not visit any hospital emergency room following the accident. On December 11, 2023, Sanchez purported to conduct an initial examination of DR at Luxen. Sanchez did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Sanchez did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Sanchez provided DR with substantially the same false list of soft tissue injury "diagnoses" that she provided virtually every other Insured. Furthermore, neither DR's presenting problems, nor the treatment plan provided to DR by Sanchez, Herman, Moleiro, and Luxen presented any risk of significant complications, morbidity, or mortality. To the contrary, DR did not need any extensive treatment at all as a result of the accident, and the treatment plan provided by Sanchez, Herman, Moleiro, and Luxen consisted of medically unnecessary physical therapy treatment, which did not pose any risk to DR if properly administered. Even so, Herman, Moleiro, and Luxen billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that Sanchez engaged in some legitimate, moderate complexity medical decision-making during the purported examination.

(x)    On December 7, 2023, an Insured named MM was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that MM's vehicle was drivable following the accident. The police report further indicated that MM was not injured and did not complain of any pain at the scene. In keeping with the fact that MM was not seriously injured, MM did not visit any hospital emergency room following the accident. On December 22, 2023, L. Gonzalez purported to conduct an initial examination of MM at Merger. L. Gonzalez did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, L. Gonzalez did not consider any significant number of diagnoses or management options in connection with the examination. Instead, L. Gonzalez provided MM with substantially the same false list of soft tissue injury "diagnoses" that she provided virtually every other Insured. Furthermore, neither MM's presenting problems, nor the treatment plan provided

43

to MM by L. Gonzalez, Herman, Moleiro, and Merger presented any risk of significant complications, morbidity, or mortality. To the contrary, MM did not need any extensive treatment at all as a result of the accident, and the treatment plan provided by L. Gonzalez, Herman, Moleiro, and All Star consisted of medically unnecessary physical therapy treatment, which did not pose any risk to MM if properly administered. Even so, Herman, Moleiro, and All Star billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that L. Gonzalez engaged in some legitimate, moderate complexity medical decision-making during the purported examination.

(xi)     On December 21, 2023, an Insured named DL was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that DL's vehicle was drivable following the accident. The police report further indicated that DL was not injured and did not complain of any pain at the scene. In keeping with the fact that DL was not seriously injured, DL did not visit any hospital emergency room following the accident. On December 26, 2023, L. Gonzalez purported to conduct an initial examination of DL at All Star. L. Gonzalez did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, L. Gonzalez did not consider any significant number of diagnoses or management options in connection with the examination. Instead, L. Gonzalez provided DL with substantially the same false list of soft tissue injury "diagnoses" that she provided virtually every other Insured. Furthermore, neither DL's presenting problems, nor the treatment plan provided to DL by L. Gonzalez, Herman, Moleiro, and All Star presented any risk of significant complications, morbidity, or mortality. To the contrary, DL did not need any extensive treatment at all as a result of the accident, and the treatment plan provided by L. Gonzalez, Herman, Moleiro, and All Star consisted of medically unnecessary physical therapy treatment, which did not pose any risk to DL if properly administered. Even so, Herman, Moleiro, and All Star billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that L. Gonzalez engaged in some legitimate, low complexity medical decision-making during the purported examination.

(xii)    On December 25, 2023, an Insured named MA was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that MA's vehicle was drivable following the accident. The police report further indicated that MA was not injured and did not complain of any pain at the scene. In keeping with the fact that MA was not seriously injured, MA did not visit any hospital emergency room following the accident. On January 12, 2024, L. Gonzalez purported to conduct an initial examination of MA at Merger. L. Gonzalez did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, L. Gonzalez did not consider any significant number of diagnoses or management options in connection with the examination. Instead, L. Gonzalez provided MA with substantially the same false

44

list of soft tissue injury "diagnoses" that she provided virtually every other Insured. Furthermore, neither MA's presenting problems, nor the treatment plan provided to MA by L. Gonzalez, Herman, Moleiro, and Merger presented any risk of significant complications, morbidity, or mortality. To the contrary, MA did not need any extensive treatment at all as a result of the accident, and the treatment plan provided by L. Gonzalez, Herman, Moleiro, and Merger consisted of medically unnecessary physical therapy treatment, which did not pose any risk to MA if properly administered. Even so, Herman, Moleiro, and Merger billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that L. Gonzalez engaged in some legitimate, moderate complexity medical decision-making during the purported examination.

(xiii)   On January 26, 2024, an Insured named RR was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that RR's vehicle was drivable following the accident. The police report further indicated that RR was not injured and did not complain of any pain at the scene. In keeping with the fact that RR was not seriously injured, RR did not visit any hospital emergency room following the accident. On February 1, 2024, Sanchez purported to conduct an initial examination of RR at Merger. Sanchez did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Sanchez did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Sanchez provided RR with substantially the same false list of soft tissue injury "diagnoses" that she provided virtually every other Insured. Furthermore, neither RR's presenting problems, nor the treatment plan provided to RR by Sanchez, Herman, Moleiro, and Merger presented any risk of significant complications, morbidity, or mortality. To the contrary, RR did not need any extensive treatment at all as a result of the accident, and the treatment plan provided by Sanchez, Herman, Moleiro, and All Star consisted of medically unnecessary physical therapy treatment, which did not pose any risk to RR if properly administered. Even so, Herman, Moleiro, and All Star billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that Sanchez engaged in some legitimate, moderate complexity medical decision-making during the purported examination.

(xiv)   On March 5, 2024, an Insured named CI was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that CI's vehicle was drivable following the accident. The police report further indicated that CI was not injured and did not complain of any pain at the scene. In keeping with the fact that CI was not seriously injured, CI did not visit any hospital emergency room following the accident. On March 7, 2024, Rodriguez purported to conduct an initial examination of CI at All Star. Rodriguez did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Rodriguez did not consider any significant number of diagnoses or

management options in connection with the examination. Instead, Rodriguez provided CI with substantially the same false list of soft tissue injury "diagnoses" that he provided virtually every other Insured. Furthermore, neither CI's presenting problems, nor the treatment plan provided to CI by Rodriguez, Herman, Moleiro, and All Star presented any risk of significant complications, morbidity, or mortality. To the contrary, CI did not need any extensive treatment at all as a result of the accident, and the treatment plan provided by Rodriguez, Herman, Moleiro, and All Star consisted of medically unnecessary physical therapy treatment, which did not pose any risk to CI if properly administered.  Even so, Herman, Moleiro, and All Star billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that Rodriguez engaged in some legitimate, low complexity medical decision-making during the purported examination.

(xv)     On May 23, 2024, an Insured named MS was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that MS's vehicle was drivable following the accident. The police report further indicated that MS was not injured and did not complain of any pain at the scene. In keeping with the fact that MS was not seriously injured, MS did not visit any hospital emergency room following the accident. On May 28, 2024, Sanchez purported to conduct an initial examination of MS at Luxen. Sanchez did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Sanchez did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Sanchez provided MS with substantially the same false list of soft tissue injury "diagnoses" that she provided virtually every other Insured. Furthermore, neither MS's presenting problems, nor the treatment plan provided to MS by Sanchez, Herman, Moleiro, and Luxen presented any risk of significant complications, morbidity, or mortality. To the contrary, MS did not need any extensive treatment at all as a result of the accident, and the treatment plan provided by Sanchez, Herman, Moleiro, and Luxen consisted of medically unnecessary physical therapy treatment, which did not pose any risk to MS if properly administered.  Even so, Herman, Moleiro, and Luxen billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that Sanchez engaged in some legitimate, moderate complexity medical decision-making during the purported examination.

144.     These are only representative examples. In the claims identified in Exhibits "1" – "3", All Star, Merger, Luxen, Moleiro, Herman, Joseph, and Jorge routinely falsely represented that the purported examinations involved legitimate moderate-complexity or low-complexity decision-making, when in fact they did not involve any legitimate medical decision-making at all.

145.    In a legitimate clinic setting, when a patient presents with a soft tissue injury such as a sprain or strain arising from an automobile accident, the initial standard of care is conservative treatment comprised of rest, ice, compression, and – if applicable – elevation of the affected body part.

146.    Even so, in the claims identified in Exhibits "1" – "3", All Star, Merger, Luxen, Moleiro, Herman, Joseph, and Jorge routinely caused Insureds to immediately begin a course of medically unnecessary physical therapy often within days of their accidents, before the Insureds had first tried a more conservative course of treatment.

147.    All Star, Merger, Luxen, Moleiro, Herman, Joseph, and Jorge routinely caused Insureds to immediately begin a course of physical therapy often within days of their accidents, or even on the same day of their accidents, because their putative initial examinations involved no legitimate medical decision-making whatsoever, and had pre-determined outcomes.

148.    There are a substantial number of variables that can affect whether, how, and to what extent an individual is injured in a given automobile accident.

149.    An individual's age, height, weight, general physical condition, location within the vehicle, and the location of the impact all will affect whether, how, and to what extent an individual is injured and in a given automobile accident.

150.    As set forth herein, in the claims identified in Exhibits "1" – "3", virtually all of the Insureds that All Star, Merger, Luxen, Moleiro, Herman, Joseph, and Jorge purported to treat were involved in relatively minor accidents.

151.    It is improbable that any two or more Insureds involved in any one of the minor automobile accidents in the claims identified in Exhibits "1" – "3" would suffer substantially similar injuries as a result of their accidents, or require a substantially similar course of treatment.

152.     It is even more improbable – to the point of impossibility – that this kind of pattern would recur with great frequency within the cohort of patients treating at individual health care clinics such as All Star, Merger, and Luxen, with numerous instances in which two or more patients who had been involved in the same accident supposedly presented with substantially similar symptoms warranting substantially similar diagnoses and treatment.

153.     Even so, in keeping with the fact that All Star, Merger, Luxen, Moleiro, Herman, Joseph, and Jorge's putative "diagnoses" were pre-determined and false, All Star, Merger, Luxen, Moleiro, Herman, Joseph, and Jorge frequently purported to provide examinations, on or about the same date, to two or more Insureds who had been involved in the same underlying accident, and at the conclusion of the examinations, caused the Insureds to be issued substantially similar, false "diagnoses", and to be recommended substantially similar courses of medically unnecessary "treatment", despite the fact that they were differently situated.

154.     For example:

(i)      On May 31, 2022, two Insureds – PA and RA – were involved in the same accident. Thereafter – incredibly – both Insureds presented at All Star for initial examinations by Martinez and Espinoza on the <u>exact same date</u>, June 9, 2022. At the conclusion of the purported initial examinations, Martinez and Espinoza – at the direction of All Star and Moleiro – provided PA and RA with substantially similar false soft tissue injury "diagnoses", and recommended a substantially similar course of medically unnecessary treatment to both of them.

(ii)     On June 20, 2022, two Insureds – LJ and MJ – were involved in the same accident. Thereafter – incredibly – both Insureds presented at All Star for initial examinations by Martinez and Espinoza on the <u>exact same date</u>, June 24, 2022. At the conclusion of the purported initial examinations, Martinez and Espinoza – at the direction of All Star and Moleiro – provided LJ and MJ with substantially similar false soft tissue injury "diagnoses", and recommended a substantially similar course of medically unnecessary treatment to both of them.

(iii)    On August 28, 2022, three Insureds – RR, JR, and LR – were involved in the same accident. Thereafter – incredibly – all three Insureds presented at Merger for initial examinations by Herman and Perez on the <u>exact same date</u>, August 29, 2022. At the conclusion of the purported initial examinations, Herman and Perez – at the

direction of Merger and Moleiro – provided RR, JR, and LR with substantially similar false soft tissue injury "diagnoses", and recommended a substantially similar course of medically unnecessary treatment to all three of them.

(iv)    On November 1, 2022, two Insureds – DB and GV – were involved in the same accident. Thereafter – incredibly – both Insureds presented at Merger for initial examinations by Herman and Perez on the <u>exact same date</u>, November 3, 2022. At the conclusion of the purported initial examinations, Herman and Perez – at the direction of Merger and Moleiro – provided DB and GV with substantially similar false soft tissue injury "diagnoses", and recommended a substantially similar course of medically unnecessary treatment to both of them.

(v)    On December 2, 2022, two Insureds – AD and AM – were involved in the same accident. Thereafter – incredibly – both Insureds presented at Merger for initial examinations by Franco on the <u>exact same date</u>, December 5, 2022. At the conclusion of the purported initial examinations, Franco – at the direction of Merger and Moleiro – provided AD and AM with substantially similar false soft tissue injury "diagnoses", and recommended a substantially similar course of medically unnecessary treatment to both of them.

(vi)    On January 19, 2023, three Insureds – VD, JR, and JV – were involved in the same accident. Thereafter – incredibly – all three Insureds presented at All Star for initial examinations by Bonilla on the <u>exact same date</u>, January 23, 2023. At the conclusion of the purported initial examinations, Bonilla – at the direction of All Star and Moleiro – provided VD, JR, and JV with substantially similar false soft tissue injury "diagnoses", and recommended a substantially similar course of medically unnecessary treatment to all of them.

(vii)    On February 15, 2023, two Insureds – WC and HC – were involved in the same accident. Thereafter – incredibly – both Insureds presented at All Star for initial examinations by Perez on the <u>exact same date</u>, February 15, 2023. At the conclusion of the purported initial examinations, Perez – at the direction of All Star and Moleiro – provided WC and HC with substantially similar false soft tissue injury "diagnoses", and recommended a substantially similar course of medically unnecessary treatment to both of them.

(viii)    On August 15, 2023, two Insureds – AM and UF – were involved in the same accident. Thereafter – incredibly – both Insureds presented at Merger for initial examinations by Herman and Perez on the <u>exact same date</u>, August 21, 2023. At the conclusion of the purported initial examinations, Herman and Perez – at the direction of Merger and Moleiro – provided AM and UF with substantially similar false soft tissue injury "diagnoses", and recommended a substantially similar course of medically unnecessary treatment to both of them.

(ix)    On March 14, 2024, two Insureds – LA and MJ – were involved in the same accident. Thereafter – incredibly – both Insureds presented at All Star for initial

examinations by Rodriguez on the <u>exact same date</u>, March 14, 2024. At the conclusion of the purported initial examinations, Rodriguez – at the direction of All Star and Moleiro – provided LA and MJ with substantially similar false soft tissue injury "diagnoses", and recommended a substantially similar course of medically unnecessary treatment to both of them.

(x)     On February 14, 2024, two Insureds – JS and MF – were involved in the same accident. Thereafter – incredibly – both Insureds presented at Luxen for initial examinations by Sanchez on the <u>exact same date</u>, February 15, 2024. At the conclusion of the purported initial examinations, Sanchez – at the direction of Luxen and Moleiro – provided JS and MF with substantially similar false soft tissue injury "diagnoses", and recommended a substantially similar course of medically unnecessary treatment to both of them.

155.    These are only representative examples. In the claims for initial examinations identified in Exhibits "1" – "3", All Star, Merger, Luxen, Moleiro, Herman, Joseph, and Jorge routinely falsely represented that the initial examinations involved medical decision-making of moderate complexity or low complexity in order to provide a false basis to bill for the initial examinations under CPT codes 99204 and 99203, because CPT codes 99204 and 99203 are reimbursable at higher rates than examinations that do not require any complex medical decision-making at all.

156.    In actuality, the initial examinations did not involve any legitimate medical decision-making at all, because the purported "results" of the examinations were pre-determined, falsified, and designed to provide a false justification for the laundry-list of other Fraudulent Services that Defendants purported to provide.

157.    In the claims for initial examinations identified in Exhibits "1" – "3", All Star, Merger, Luxen, Moleiro, Herman, Joseph, and Jorge routinely fraudulently misrepresented that the examinations were lawfully provided and eligible for PIP reimbursement, when in fact they were neither lawfully provided nor reimbursable because:

(i)     the putative examinations were illusory, with outcomes that were pre-determined to result in substantially similar, false "diagnoses" and treatment recommendations, regardless of the Insureds' true individual circumstances and presentation;

(ii)    the charges for the putative examinations misrepresented the nature, extent, and results of the examinations; and

(iii)   All Star, Merger, Luxen, Moleiro, Herman, Joseph, and Jorge never were eligible to collect PIP Benefits in connection with the examinations in the first instance, inasmuch as they operated in violation of Florida law.

**2.      The Fraudulent Charges for Follow-Up Examinations at All Star, Merger, and Luxen**

158.    In addition to their fraudulent initial examinations, All Star, Merger, Luxen, Moleiro, Herman, Joseph, and Jorge virtually always purported to subject each of the Insureds in the claims identified in Exhibits "1" – "3" to one or more fraudulent follow-up examination(s) during the course of their fraudulent treatment and billing protocol.

159.    The Clinic Defendant Nurses and Clinic Defendant Chiropractors purported to personally perform virtually all of the follow-up examinations identified in Exhibits "1" – "3".

160.    As set forth in Exhibits "1" – "3", All Star, Merger, Luxen, Moleiro, Herman, Joseph, and Jorge then typically billed the purported follow-up examinations through All Star, Merger, and Luxen to GEICO under: (i) CPT code 99213, virtually always resulting in a charge of between $131.04 to $250.00 for each putative follow-up examination; (ii) CPT code 99214, virtually always resulting in a charge of $350.00 for each putative follow-up examination; and (iii) CPT code 99215, virtually always resulting in a charge of between $250.00 to $400.00 for each putative follow-up examination.

161.    In the claims for follow-up examinations identified in Exhibits "1" – "3", the charges for the follow-up examinations were fraudulent in that they misrepresented All Star, Merger, and Luxen's eligibility to collect PIP Benefits in the first instance.

162.     In fact, and as set forth herein, All Star, Merger, and Luxen never were eligible to collect PIP Benefits, inasmuch as they were operated in violation of Florida law.

163.     As set forth below, All Star, Merger, Luxen, Moleiro, Herman, Joseph, and Jorge's charges for the follow-up examinations identified in Exhibits "1" – "3" were also fraudulent in that they misrepresented the nature, extent, and results of the purported follow-up examinations.

**a.     Misrepresentations Regarding the Severity of the Insureds' Presenting Problems**

164.     Pursuant to the CPT Assistant, the use of CPT codes 99215 and 99214 to bill for a follow-up examination represented – among other things – that the patient presented with problems of moderate to high severity at the time of the examination.

165.     Moreover, pursuant to the CPT Assistant, the use of CPT code 99213 to bill for a follow-up examination represented – among other things – that the patient presented with problems of low to moderate severity at the time of the examination.

166.     However, to the extent that the Insureds in the claims identified in Exhibits "1" – "3" suffered any injuries at all in their automobile accidents, the injuries were virtually always minor soft tissue injures such as sprains and strains, which were of low or minimal severity, even at their onset.

167.     Minor soft tissue injuries such as sprains and strains virtually always resolve after a short course of conservative treatment or no treatment at all. By the time the Insureds in the claims identified in Exhibits "1" – "3" presented for their putative follow-up examinations – typically weeks or months after their minor accidents – the Insureds either did not have any genuine presenting problems at all as a result of their minor automobile accidents, or else their presenting problems were minimal.

168.    Even so, in the claims for the follow-up examinations under identified in Exhibits "1" – "3", All Star, Merger, Luxen, Moleiro, Herman, Joseph, and Jorge represented that the Insureds presented with problems of low to moderate, or moderate to high severity, when in fact the Insureds' problems were minimal severity soft tissue injures such as sprains and strains, to the limited extent that they had any presenting problems at all at the time of the purported examinations.

169.    For example,

(i)     On March 17, 2022, an Insured named MP was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that MP's vehicle was drivable following the accident. The police report further indicated that MP was not injured and did not complain of any pain at the scene. In keeping with the fact that MP was not seriously injured, MP did not visit any hospital emergency room following the accident. To the extent that MP experienced any health problems at all as a result of the accident, they were of low or minimal severity, even at their onset, and had completely resolved or were minimal within 2-3 weeks of the accident. Even so, following a purported follow-up examination of MP by R. Fernandez on April 22, 2022, Moleiro, Jorge, and Merger billed GEICO for the follow-up examination using CPT code 99213, and thereby falsely represented that MP presented with problems of low to moderate severity during the examination.

(ii)    On June 20, 2022, an Insured named LJ was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that LJ's vehicle was drivable following the accident. The police report further indicated that LJ was not injured and did not complain of any pain at the scene. In keeping with the fact that LJ was not seriously injured, LJ did not visit any hospital emergency room following the accident. To the extent that LJ experienced any health problems at all as a result of the accident, they were of low or minimal severity, even at their onset, and had completely resolved or were minimal within 2-3 weeks of the accident. Even so, following a purported follow-up examination of LJ by Martinez on July 11, 2022, Moleiro, Joseph, and All Star billed GEICO for the follow-up examination using CPT code 99213, and thereby falsely represented that LJ presented with problems of low to moderate severity during the examination.

(iii)   On September 6, 2022, an Insured named VV was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that VV's vehicle was drivable following the accident. The police report further indicated that VV was not injured and did not

complain of any pain at the scene. In keeping with the fact that VV was not seriously injured, VV did not visit any hospital emergency room following the accident. To the extent that VV experienced any health problems at all as a result of the accident, they were of low or minimal severity, even at their onset, and had completely resolved or were minimal within 2-3 weeks of the accident. Even so, following a purported follow-up examination of VV by Franco on November 1, 2022, Moleiro, Herman, and All Star billed GEICO for the follow-up examination using CPT code 99215, and thereby falsely represented that VV presented with problems of moderate to high severity during the examination.

(iv)     On December 2, 2022, an Insured named FF was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that FF's vehicle was drivable following the accident. The police report further indicated that FF was not injured and did not complain of any pain at the scene. In keeping with the fact that FF was not seriously injured, FF did not visit any hospital emergency room following the accident. To the extent that FF experienced any health problems at all as a result of the accident, they were of low or minimal severity, even at their onset, and had completely resolved or were minimal within 2-3 weeks of the accident. Even so, following a purported follow-up examination of FF by Perez on January 12, 2023, Moleiro, Herman, and Merger billed GEICO for the follow-up examination using CPT code 99214, and thereby falsely represented that FF presented with problems of moderate to high severity during the examination.

(v)     On January 19, 2023, an Insured named JV was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that JV's vehicle was drivable following the accident. The police report further indicate that JV was not injured and did not complain of any pain at the scene. In keeping with the fact that JV was not seriously injured, JV did not visit any hospital emergency room following the accident. To the extent that JV experienced any health problems at all as a result of the accident, they were of low or minimal severity, even at their onset, and had completely resolved or were minimal within 2-3 weeks of the accident. Even so, following a purported follow-up examination of JV by Bonilla on March 6, 2023, Moleiro, Herman, and All Star billed GEICO for the follow-up examination using CPT code 99215, and thereby falsely represented that JV presented with problems of moderate to high severity during the examination.

(vi)     On January 22, 2023, an Insured named MA was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that MA's vehicle was drivable following the accident. The police report further indicated that MA was not injured and did not complain of any pain at the scene. In keeping with the fact that MA was not seriously injured, MA did not visit any hospital emergency room following the accident. To the extent that MA experienced any health problems at all as a result of the accident, they were of low or minimal severity, even at their onset, and had

completely resolved or were minimal within 2-3 weeks of the accident. Even so, following a purported follow-up examination of MA by Sierra on April 17, 2023, Moleiro, Herman, and All Star billed GEICO for the follow-up examination using CPT code 99213, and thereby falsely represented that MA presented with problems of low to moderate severity during the examination.

(vii)    On July 24, 2023, an Insured named JB was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that JB's vehicle was drivable following the accident. The police report further indicated that JB was not injured and did not complain of any pain at the scene. In keeping with the fact that JB was not seriously injured, JB did not visit any hospital emergency room following the accident. To the extent that JB experienced any health problems at all as a result of the accident, they were of low or minimal severity, even at their onset, and had completely resolved or were minimal within 2-3 weeks of the accident. Even so, following a purported follow-up examination of JB by Perez on September 5, 2023, Moleiro, Herman, and All Star billed GEICO for the follow-up examination using CPT code 99213, and thereby falsely represented that JB presented with problems of moderate to high severity during the examination.

(viii)   On October 25, 2023, an Insured named AC was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that AC's vehicle was drivable following the accident. The police report further indicated that AC was not injured and did not complain of any pain at the scene. In keeping with the fact that AC was not seriously injured, AC did not visit any hospital emergency room following the accident. To the extent that AC experienced any health problems at all as a result of the accident, they were of low or minimal severity, even at their onset, and had completely resolved or were minimal within 2-3 weeks of the accident. Even so, following a purported follow-up examination of AC by L. Gonzalez on December 1, 2023, Moleiro, Herman, and Luxen billed GEICO for the follow-up examination using CPT code 99215, and thereby falsely represented that AC presented with problems of moderate to high severity during the examination.

(ix)     On November 11, 2023, an Insured named YB was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that YB's vehicle was drivable following the accident. The police report further indicated that YB was not injured and did not complain of any pain at the scene. In keeping with the fact that YB was not seriously injured, YB did not visit any hospital emergency room following the accident. To the extent that YB experienced any health problems at all as a result of the accident, they were of low or minimal severity, even at their onset, and had completely resolved or were minimal within 2-3 weeks of the accident. Even so, following a purported follow-up examination of YB by Sanchez on January 25, 2024, Moleiro, Herman, and Luxen billed GEICO for the follow-up examination using CPT

99214, and thereby falsely represented that YB presented with problems of moderate to high severity during the examination.

(x)     On November 29, 2023, an Insured named EM was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that EM's vehicle was drivable following the accident. The police report further indicated that EM was not injured and did not complain of any pain at the scene. In keeping with the fact that EM was not seriously injured, EM did not visit any hospital emergency room following the accident. To the extent that EM experienced any health problems at all as a result of the accident, they were of low or minimal severity, even at their onset, and had completely resolved or were minimal within 2-3 weeks of the accident. Even so, following a purported follow-up examination of EM by Sanchez on January 12, 2024, Moleiro, Herman, and Luxen billed GEICO for the follow-up examination using CPT code 99215, and thereby falsely represented that EM presented with problems of moderate to high severity during the examination.

(xi)    On December 9, 2023, an Insured named MH was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that MH's vehicle was drivable following the accident. The police report further indicated that MH was not injured and did not complain of any pain at the scene. In keeping with the fact that MH was not seriously injured, MH did not visit any hospital emergency room following the accident. To the extent that MH experienced any health problems at all as a result of the accident, they were of low or minimal severity, even at their onset, and had completely resolved or were minimal within 2-3 weeks of the accident. Even so, following a purported follow-up examination of MH by L. Gonzalez on April 1, 2024, Moleiro, Herman, and Luxen billed GEICO for the follow-up examination using CPT code 99214, and thereby falsely represented that MH presented with problems of moderate to high severity during the examination.

(xii)   On December 17, 2023, an Insured named MM was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that MM's vehicle was drivable following the accident. The police report further indicated that MM was not injured and did not complain of any pain at the scene. In keeping with the fact that MM was not seriously injured, MM did not visit any hospital emergency room following the accident. To the extent that MM experienced any health problems at all as a result of the accident, they were of low or minimal severity, even at their onset, and had completely resolved or were minimal within 2-3 weeks of the accident. Even so, following a purported follow-up examination of MM by L. Gonzalez on March 25, 2024, Moleiro, Herman, and Merger billed GEICO for the follow-up examination using CPT code 99215, and thereby falsely represented that MM presented with problems of moderate to high severity during the examination.

(xiii)   On December 25, 2023, an Insured named MA was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that MA's vehicle was drivable following the accident. The police report further indicated that MA was not injured and did not complain of any pain at the scene. In keeping with the fact that MA was not seriously injured, MA did not visit any hospital emergency room following the accident. To the extent that MA experienced any health problems at all as a result of the accident, they were of low or minimal severity, even at their onset, and had completely resolved or were minimal within 2-3 weeks of the accident. Even so, following a purported follow-up examination of MA by L. Gonzalez on April 19, 2024, Moleiro, Herman, and Merger billed GEICO for the follow-up examination using CPT code 99213, and thereby falsely represented that MA presented with problems of low to moderate severity during the examination.

(xiv)   On January 26, 2024, an Insured named RR was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that RR's vehicle was drivable following the accident. The police report further indicated that RR was not injured and did not complain of any pain at the scene. In keeping with the fact that RR was not seriously injured, RR did not visit any hospital emergency room following the accident. To the extent that RR experienced any health problems at all as a result of the accident, they were of low or minimal severity, even at their onset, and had completely resolved or were minimal within 2-3 weeks of the accident. Even so, following a purported follow-up examination of RR by L. Gonzalez on March 15, 2024, Moleiro, Herman, and Merger billed GEICO for the follow-up examination using CPT code 99214, and thereby falsely represented that RR presented with problems of moderate to high severity during the examination.

(xv)   On February 21, 2024, an Insured named YE was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that YE's vehicle was drivable following the accident. The police report further indicated that YE was not injured and did not complain of any pain at the scene. In keeping with the fact that YE was not seriously injured, YE did not visit any hospital emergency room following the accident. To the extent that YE experienced any health problems at all as a result of the accident, they were of low or minimal severity, even at their onset, and had completely resolved or were minimal within 2-3 weeks of the accident. Even so, following a purported follow-up examination of YE by Sanchez on April 4, 2024, Moleiro, Herman, and Luxen billed GEICO for the follow-up examination using CPT code 99214, and thereby falsely represented that YE presented with problems of moderate to high severity during the examination.

170.   These are only representative examples. In the claims for follow-up examinations identified in Exhibits "1" – "3", All Star, Merger, Luxen, Moleiro, Herman, Joseph, and Jorge

routinely falsely represented that the Insureds presented with problems of either low to moderate severity or moderate to high severity in order to create a false basis for their charges for initial examinations under CPT codes 99215, 99214, and 99213, because follow-up examinations billable under CPT codes 99215, 99214, and 99213 are reimbursable at higher rates than examinations involving presenting problems of minimal severity, or no severity.

171.    In the claims for follow-up examinations identified in Exhibits "1" – "3", All Star, Merger, Luxen, Moleiro, Herman, Joseph, and Jorge also routinely falsely represented that the Insureds presented with problems of either low to moderate severity or moderate to high severity in order to create a false basis for the other Fraudulent Services that Defendants purported to provide to the Insureds.

**(i)     Misrepresentations Regarding the Nature, Extent, and Results of the Follow-Up Examinations**

172.    Pursuant to the CPT Assistant, the use of CPT code 99213 to bill for a follow-up examination represents – among other things – that the examining practitioner performed at least two of the following three components during the examination: (i) took an "expanded problem focused" patient history; (ii) conducted an "expanded problem focused" physical examination; and (iii) engaged in medical decision-making of "low complexity".

173.    Pursuant to the CPT Assistant, the use of CPT code 99214 to bill for a follow-up examination represents – among other things – that the examining practitioner performed at least two of the following three components during the examination: (i) took a "detailed" patient history; (ii) conducted a "detailed" physical examination; and (iii) engaged in medical decision-making of "moderate complexity".

174.    Pursuant to the CPT Assistant, the use of CPT code 99215 to bill for a follow-up examination represents – among other things – that the examining physician performed at least

two of the three following components during the examination: (i) took a "comprehensive" patient history; (ii) conducted a "comprehensive" physical examination; and (iii) engaged in medical decision-making of "high complexity".

175.    Though All Star, Merger, Luxen, Moleiro, Herman, Joseph, and Jorge routinely billed for the purported follow-up examinations using CPT codes 99213, 99214, and 99215, neither the Clinic Defendant Nurses, Clinic Defendant Chiropractors, nor any other practitioners associated with All Star, Merger, and Luxen took any legitimate patient histories, conducted any legitimate physical examinations, or engaged in any legitimate medical decision-making at all.

176.    Rather, in the claims identified in Exhibits "1" – "3", following the purported follow-up examinations, All Star, Merger, Luxen, Moleiro, Herman, Joseph, and Jorge simply: (i) caused the Insureds to receive substantially the same false, boilerplate "diagnoses" as they had received during their purported initial examination; and either (ii) caused the Insureds to be referred for even more medically unnecessary physical therapy services, despite the fact that the Insureds purportedly already had received extensive physical therapy services that supposedly had not been successful in resolving their purported pain symptoms; or (iii) discharged the Insureds from "treatment", to the extent that their PIP Benefits had been exhausted.

177.    The putative "follow-up" examinations that All Star, Merger, Luxen, Moleiro, Herman, Joseph, and Jorge purported to provide the Insureds in the claims identified in Exhibits "1" – "3" therefore were medically useless, and played no legitimate role in the treatment or care of the Insureds, because the putative "results" of the examinations were pre-determined to comport with the medically unnecessary treatment plan that was pre-determined for each Insured from the moment they walked into Defendants' offices.

178.     In the claims for follow-up examinations identified in Exhibits "1" – "3", All Star, Merger, Luxen, Moleiro, Herman, Joseph, and Jorge fraudulently misrepresented that the examinations were lawfully provided and reimbursable, when in fact they were neither lawfully provided nor reimbursable, because:

(i)     the putative examinations were illusory, with outcomes that were pre-determined to result in substantially similar, false "diagnoses" and treatment recommendations, regardless of the Insureds' true individual circumstances and presentation;

(ii)    the charges for the putative examinations misrepresented the nature and extent of the examinations; and

(iii)   All Star, Merger, and Luxen never were eligible to collect PIP Benefits in connection with the examinations in the first instance, inasmuch as they were operated in violation of Florida law.

## 3.     The Fraudulent and Unlawful Charges for "Extracorporeal Shockwave Therapy" at All Star, Merger, and Luxen

179.    Based upon the false, boilerplate "diagnoses" that the Insureds received during the purported initial and follow-up examinations at All Star, Merger, and Luxen, All Star, Merger, Luxen, Moleiro, and Herman also purported to subject many of the Insureds in the claims identified in Exhibits "1" – "3" to one or more sessions of ESWT during the course of their fraudulent treatment protocol.

180.    Typically, the Clinic Defendant Nurses and Clinic Defendant Chiropractors purported to perform the ESWT at All Star, Merger, and Luxen, which then was billed through All Star, Merger, and Luxen to GEICO under CPT code 0101T, virtually always resulting in a charge of $850.00 for each round of ESWT that supposedly was provided.

181.    Like the charges for the other Fraudulent Services, the charges for ESWT were fraudulent in that the ESWT was medically unnecessary.

182.    In keeping with the fact that All Star, Merger, Luxen, Moleiro, and Herman's ESWT "treatments" were medically unnecessary, ESWT has not been approved by the U.S. Food and Drug Administration ("FDA") for the treatment of back, neck, or shoulder pain, CMS has published coverage guidance stating that ESWT is not reasonable and necessary for the treatment of musculoskeletal conditions, and there are no legitimate peer reviewed data that establish the effectiveness of ESWT for the treatment of back, neck, or shoulder pain.

183.    Even so, All Star, Merger, Luxen, Moleiro, and Herman purported to provide medically unnecessary ESWT to hundreds of Insureds pursuant to their pre-determined fraudulent treatment protocol without regard to each Insured's individual complaints, symptoms, or presentation.

184.    For example:

(i)     On or about September 20, 2023, All Star, Moleiro, and Herman billed GEICO for medically unnecessary ESWT they purported to provide to an Insured named AA.

(ii)    On or about October 27, 2023, Luxen, Moleiro, and Herman billed GEICO for medically unnecessary ESWT they purported to provide to an Insured named HM.

(iii)   On or about October 31, 2023, Merger, Moleiro, and Herman billed GEICO for medically unnecessary ESWT they purported to provide to an Insured named MG.

(iv)    On or about November 27, 2023, All Star, Moleiro, and Herman billed GEICO for medically unnecessary ESWT they purported to provide to an Insured named AD.

(v)     On December 12, 2023, Luxen, Moleiro, and Herman billed GEICO for medically unnecessary ESWT they purported to provide to an Insured named PD.

(vi)    On or about December 14, 2023, Merger, Moleiro, and Herman billed GEICO for medically unnecessary ESWT they purported to provide to an Insured named MM.

(vii)   On or about December 20, 2023, All Star, Moleiro, and Herman billed GEICO for medically unnecessary ESWT they purported to provide to an Insured named TH.

(viii)  On or about January 4, 2024, Luxen, Moleiro, and Herman billed GEICO for medically unnecessary ESWT they purported to provide to an Insured named BG.

(ix)     On or about January 17, 2024, All Star, Moleiro, and Herman billed GEICO for medically unnecessary ESWT they purported to provide to an Insured named RV.

(x)      On or about January 26, 2024, Merger, Moleiro, and Herman billed GEICO for medically unnecessary ESWT they purported to provide to an Insured named MM.

(xi)     On or about February 16, 2024, Merger, Moleiro, and Herman billed GEICO for medically unnecessary ESWT they purported to provide to an Insured named KP.

(xii)    On February 22, 2024, Luxen, Moleiro, and Herman billed GEICO for medically unnecessary ESWT they purported to provide to an Insured named MR.

(xiii)   On March 12, 2024, All Star, Moleiro, and Herman billed GEICO for medically unnecessary ESWT they purported to provide to an Insured named JB.

(xiv)    On or about April 11, 2024, Merger, Moleiro, and Herman billed GEICO for medically unnecessary ESWT they purported to provide to an Insured named IF.

(xv)     On or about April 26, 2024, Luxen, Moleiro, and Herman billed GEICO for medically unnecessary ESWT they purported to provide to an Insured named AD.

(xvi)    On or about May 2, 2024, All Star, Moleiro, and Herman billed GEICO for medically unnecessary ESWT they purported to provide to an Insured named WP.

(xvii)   On or about May 6, 2024, Merger, Moleiro, and Herman billed GEICO for medically unnecessary ESWT they purported to provide to an Insured named MC.

(xviii)  On or about May 29, 2024, Luxen, Moleiro, and Herman billed GEICO for medically unnecessary ESWT they purported to provide to an Insured named CC.

(xix)    On or about June 7, 2024, Merger, Moleiro, and Herman billed GEICO for medically unnecessary ESWT they purported to provide to an Insured named EP.

(xx)     On or about June 12, 2024, All Star, Merger, and Herman billed GEICO for medically unnecessary ESWT they purported to provide to an Insured named BM.

(xxi)    On or about June 17, 2024, Merger, Moleiro, and Herman billed GEICO for medically unnecessary ESWT they purported to provide to an Insured named JS.

(xxii)   On or about June 27, 2024, All Star, Moleiro, and Herman billed GEICO for medically unnecessary ESWT they purported to provide to an Insured named JG.

(xxiii)  On or about August 9, 202, Luxen, Moleiro, and Herman billed GEICO for medically unnecessary ESWT they purported to provide to an Insured named SR.

(xxiv) On or about August 15, 2024, Merger, Moleiro, and Herman billed GEICO for medically unnecessary ESWT they purported to provide to an Insured named EV.

(xxv) On or about September 12, 2024, Luxen, Moleiro, and Herman billed GEICO for medically unnecessary ESWT they purported to provide to an Insured named KD.

185.    These are only representative examples. In the claims for ESWT identified in Exhibits "1" – "3", All Star, Merger, Luxen, Moleiro, and Herman routinely billed GEICO for medically unnecessary ESWT they purported to provide to Insureds.

### 4.    The Fraudulent and Unlawful Charges for Physical Therapy Services at All Star, Merger, and Luxen

186.    In addition to the fraudulent initial examinations, follow-up examinations, and ESWT, All Star, Merger, Luxen, Moleiro, Herman, Joseph, and Jorge virtually always purported to subject each of the Insureds in the claims identified in Exhibits "1" – "3" to months of medically unnecessary physical therapy.

187.    Specifically, All Star, Merger, Luxen, Moleiro, Herman, Joseph, and Jorge caused virtually every Insured to receive two to four months of purported physical therapy services.

188.    In addition, All Star, Merger, Luxen, Moleiro, Herman, Joseph, and Jorge caused virtually every Insured to receive substantially similar types of physical therapy services, including: (i) mechanical traction; (ii) unlisted modality treatments; (iii) therapeutic exercises; (iv) neuromuscular reeducation; and (v) therapeutic activities.

189.    As set forth in Exhibits "1" – "3", All Star, Merger, Luxen, Moleiro, Herman, Joseph, and Jorge then billed the physical therapy services to GEICO under:

(i)     CPT code 97012, for putative mechanical traction therapy, typically resulting in a charge of $32.86 for each round of mechanical traction therapy they purported to provide;

(ii)    CPT code 97039, for putative mechanical traction therapy, typically resulting in charges ranging from $15.00 to $35.00 for each round of mechanical traction therapy they purported to provide;

(iii)    CPT code 97110, for putative therapeutic exercise, typically resulting in charges ranging from $65.00 to $65.12 for each round of therapeutic exercises they purported to provide;

(iv)    CPT code 97112, for putative neuromuscular reeducation, typically resulting in charges of $73.00 for each round of neuromuscular reeducation they purported to provide; and

(v)    CPT code 97530, for putative therapeutic activities, typically resulting in charges of $75.00 to $85.00 for each round of therapeutic activities they purported to provide.

190.    In the claims for physical therapy services identified in Exhibits "1" – "3", the charges for physical therapy services were fraudulent in that they misrepresented All Star, Merger, Luxen, Moleiro, Herman, Joseph, and Jorge's eligibility to collect PIP Benefits in the first instance.

191.    In fact, and as set forth herein, Defendants never were eligible to collect PIP Benefits, because of their fraudulent and unlawful activities.

192.    Furthermore, the purported physical therapy services that were billed through All Star, Merger, and Luxen were unlawfully performed by massage therapists and unlicensed individuals, and unlawfully billed to GEICO.

193.    What is more, the physical therapy services that were billed through All Star, Merger, and Luxen to GEICO were not medically necessary, as Defendants did not tailor the physical therapy services they purported to provide to each Insured's individual circumstances and presentation.

194.    There are a large number of individual types of physical therapy services that potentially can be provided to a patient, depending on the patient's individual symptomatology and needs. In a legitimate clinical setting, the types of physical therapy services that are provided, and the schedule for the physical therapy services, should vary significantly from patient-to-patient.

195.    However, All Star, Merger, Luxen, Moleiro, Herman, Joseph, and Jorge routinely purported to provide the same handful of physical therapy "treatments" to virtually every Insured in the claims identified in Exhibits "1" – "3", on substantially the same schedule, without regard for the Insureds' individual circumstances.

196.    Specifically, All Star, Merger, Luxen, Moleiro, Herman, Joseph, and Jorge purported to provide virtually every Insured in the claims identified in Exhibits "1" – "3" with two-to-four months of physical therapy services, consisting of mechanical traction, unlisted modality treatments, therapeutic exercises, neuromuscular reeducation. and therapeutic activities.

**5.    Defendants' Violations of the Patient Brokering Act and the Anti-Kickback Statute, and the Fraudulent and Unlawful Billing for Medically Unnecessary Diagnostic Imaging Services at Mazel Medical**

197.    In the claims identified in Exhibit "4" that were submitted after Diaz assumed ownership over Mazel Medical, Mazel Medical, Diaz, and Zuazu's ability to bill GEICO and other insurers depended on Mazel Medical's ability to gain access to patients who were willing to report for diagnostic imaging services, including x-rays and magnetic resonance imaging ("MRIs"), regardless of whether those services were medically necessary.

198.    However, Mazel Medical did not engage in any legitimate advertising or marketing efforts aimed at developing a patient base or goodwill.

199.    Instead, Mazel Medical and Diaz paid unlawful compensation to All Star, Merger, and Moleiro in exchange for x-ray and MRI referrals.

200.    In exchange for this unlawful compensation, All Star, Merger, and Moleiro caused approximately half of the Insureds who supposedly received treatment from All Star and Merger to be referred to Mazel Medical for medically unwarranted x-rays and MRIs.

201.    In keeping with the fact that the referrals from All Star and Merger to Mazel Medical were predicated on unlawful compensation, rather than medically necessity, in a legitimate clinic setting, x-rays and MRIs should not be used as an initial form of diagnostic imaging in the treatment of patients complaining of soft tissue injuries such as sprains and strains secondary to automobile accidents.

202.    It is generally inappropriate to subject Insureds with soft tissue injures to x-rays or MRIs, let alone multiple x-rays and MRIs, in the immediate aftermath of the injury, before the patient has first tried a more conservative course of rest, ice, compression, and – if applicable – elevation of the affected body part.

203.    For example, the American College of Radiology – an almost 100-year-old professional organization with a mission to serve patients and society by empowering members to advance the practice, science, and professions of radiological care – had indicated that MRIs usually are not appropriate as a first-line diagnostic tool in the treatment of patients complaining of soft tissue injures secondary to automobile accidents.

204.    What is more, the American College of Radiology has indicated that x-rays are usually not appropriate as a first-line diagnostic tool for patients complaining of acute spine trauma or acute low back pain.

205.    Along similar lines, the American College of Physicians – a more than 100-year-old professional organization with a mission to enhance the quality and effectiveness of health care by fostering excellence and professionalism in the practice of medicine – likewise has indicated that MRIs usually are not appropriate as a first-line diagnostic tool in the treatment of patients complaining of soft tissue injuries secondary to automobile accidents.

206.    Even so, in exchange for unlawful compensation from Mazel Medical and Diaz, All Star, Merger, and Moleiro routinely caused Insureds to be referred to Mazel Medical for medically unnecessary MRIs and x-rays as an initial form of diagnostic imaging soon after the Insureds' underlying automobile accidents. This, despite the fact that the Insureds had not suffered any injuries that would warrant MRIs and x-rays, and – in any case – had not, and could not have, legitimately tried and failed a course of conservative treatment at the time when the MRIs and x-rays purportedly were provided.

207.    For example:

(i)     On June 20, 2022, an Insured named LJ was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that LJ's vehicle was drivable following the accident. The police report further indicated that LJ was not injured and did not complain of any pain at the scene. In keeping with the fact that LJ was not seriously injured, LJ did not visit any hospital emergency room following the accident. To the extent that LJ experienced any health problems at all as a result of the accident, they were minor soft tissue injuries that did not require MRIs, especially before the Insured had failed a course of conservative treatment. Even so, in exchange for unlawful compensation from Mazel Medical and Diaz, on or about July 11, 2022, Moleiro caused LJ to be referred from All Star to Mazel Medical for a medically unnecessary MRI of LJ's cervical spine – before LJ had a chance to complete any legitimate course of conservative treatment.

(ii)    On August 15, 2022, an Insured named BF was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that BF's vehicle was drivable following the accident. The police report further indicated that BF was not injured and did not complain of any pain at the scene. In keeping with the fact that BF was not seriously injured, BF did not visit any hospital emergency room following the accident. To the extent that BF experienced any health problems at all as a result of the accident, they were minor soft tissue injuries that did not require x-rays, especially before the Insured had failed a course of conservative treatment. Even so, in exchange for unlawful compensation from Mazel Medical and Diaz, on or about August 24, 2022, Moleiro caused BF to be referred from All Star to Mazel Medical for a medically unnecessary x-ray of BF's right ankle and cervical, thoracic, and lumbar spine – before BF had a chance to complete any legitimate course of conservative treatment.

(iii)     On September 7, 2022, an Insured named JP was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that JP's vehicle was drivable following the accident. The police report further indicated that JP was not injured and did not complain of any pain at the scene. In keeping with the fact that JP was not seriously injured, JP did not visit any hospital emergency room following the accident. To the extent that JP experienced any health problems at all as a result of the accident, they were minor soft tissue injuries that did not require MRIs, especially before the Insured had failed a course of conservative treatment. Even so, in exchange for unlawful compensation from Mazel Medical and Diaz, on or about September 8, 2022, Moleiro caused JP to be referred from Merger to Mazel Medical for a medically unnecessary MRI of JP's left hip – before JP had a chance to complete any legitimate course of conservative treatment.

(iv)     On December 2, 2022, an Insured named FP was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that FP's vehicle was drivable following the accident. The police report further indicated that FP was not injured and did not complain of any pain at the scene. In keeping with the fact that FP was not seriously injured, FP did not visit any hospital emergency room following the accident. To the extent that FP experienced any health problems at all as a result of the accident, they were minor soft tissue injuries that did not require MRIs, especially before the Insured had failed a course of conservative treatment. Even so, in exchange for unlawful compensation from Mazel Medical and Diaz, on or about December 15, 2023, Moleiro caused FP to be referred from Merger to Mazel Medical for a medically unnecessary MRI of FP's lumbar spine – before FP had a chance to complete any legitimate course of conservative treatment.

(v)     On November 1, 2022, an Insured named RM was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that RM's vehicle was drivable following the accident. The police report further indicated that RM was not injured and did not complain of any pain at the scene. In keeping with the fact that RM was not seriously injured, RM did not visit any hospital emergency room following the accident. To the extent that RM experienced any health problems at all as a result of the accident, they were minor soft tissue injuries that did not require x-rays, especially before the Insured had failed a course of conservative treatment. Even so, in exchange for unlawful compensation from Mazel Medical and Diaz, on or about November 1, 2022, Moleiro caused RM to be referred from Merger to Mazel Medical for medically unnecessary x-rays of RM's left knee, right knee, left shoulder, right elbow, and cervical and thoracic spine – before RM had a chance to complete any legitimate course of conservative treatment.

(vi)     On February 4, 2023, an Insured named AR was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that AR's vehicle was drivable following the

accident. The police report further indicated that AR was not injured and did not complain of any pain at the scene. In keeping with the fact that AR was not seriously injured, AR did not visit any hospital emergency room following the accident. To the extent that AR experienced any health problems at all as a result of the accident, they were minor soft tissue injuries that did not require x-rays, especially before the Insured had failed a course of conservative treatment. Even so, in exchange for unlawful compensation from Mazel Medical and Diaz, on or about February 6, 2023, Moleiro caused AR to be referred from Merger to Mazel Medical for medically unnecessary x-rays of AR's left shoulder, left knee, left elbow, left wrist, left ankle, left foot, and cervical, thoracic, and lumbar spine – before AR had a chance to complete any legitimate course of conservative treatment.

(vii)     On March 29, 2023, an Insured named OR was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that OR's vehicle was drivable following the accident. The police report further indicated that OR was not injured and did not complain of any pain at the scene. In keeping with the fact that OR was not seriously injured, OR did not visit any hospital emergency room following the accident. To the extent that OR experienced any health problems at all as a result of the accident, they were minor soft tissue injuries that did not require x-rays, especially before the Insured had failed a course of conservative treatment. Even so, in exchange for unlawful compensation from Mazel Medical and Diaz, on or about March 30, 2023, Moleiro caused OR to be referred from All Star to Mazel Medical for medically unnecessary x-rays of OR's right shoulder, right knee, and cervical, thoracic, and lumbar spine – before OR had a chance to complete any legitimate course of conservative treatment.

(viii)    On June 1, 2023, an Insured named DM was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that DM's vehicle was drivable following the accident. The police report further indicated that DM was not injured and did not complain of any pain at the scene. In keeping with the fact that DM was not seriously injured, DM did not visit any hospital emergency room following the accident. To the extent that DM experienced any health problems at all as a result of the accident, they were minor soft tissue injuries that did not require x-rays, especially before the Insured had failed a course of conservative treatment. Even so, in exchange for unlawful compensation from Mazel Medical and Diaz, on or about June 6, 2023, Moleiro caused DM to be referred from All Star to Mazel Medical for medically unnecessary x-rays of DM's left shoulder and cervical, thoracic, and lumbar spine – before DM had a chance to complete any legitimate course of conservative treatment.

(ix)      On November 20, 2023, an Insured named TH was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that TH's vehicle was drivable following the accident. The police report further indicated that TH was not injured and did not

complain of any pain at the scene. In keeping with the fact that TH was not seriously injured, TH did not visit any hospital emergency room following the accident. To the extent that TH experienced any health problems at all as a result of the accident, they were minor soft tissue injuries that did not require x-rays, especially before the Insured had failed a course of conservative treatment. Even so, in exchange for unlawful compensation from Mazel Medical and Diaz, on or about November 21, 2023, Moleiro caused TH to be referred from All Star to Mazel Medical for medically unnecessary x-rays of TH's left shoulder, left elbow, and cervical, thoracic, and lumbar spine – before TH had a chance to complete any legitimate course of conservative treatment.

(x)     On December 21, 2023, an Insured named DR was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that DL's vehicle was drivable following the accident. The police report further indicated that DL was not injured and did not complain of any pain at the scene. In keeping with the fact that DL was not seriously injured, DL did not visit any hospital emergency room following the accident. To the extent that DL experienced any health problems at all as a result of the accident, they were minor soft tissue injuries that did not require x-rays, especially before the Insured had failed a course of conservative treatment. Even so, in exchange for unlawful compensation from Mazel Medical and Diaz, on or about December 26, 2023, Moleiro caused DL to be referred from All Star to Mazel Medical for medically unnecessary x-rays of DL's left shoulder and cervical, thoracic, and lumbar spine – before DL had a chance to complete any legitimate course of conservative treatment.

208.    These are only representative examples. In the claims identified in Exhibits "1" – "2" and "4", All Star, Merger, and Moleiro routinely caused Insureds to be referred to Mazel Medical for medically unnecessary x-rays and MRIs in exchange for unlawful compensation from Mazel Medical and Diaz.

209.    In this context, it is improbable that two or more Insureds involved in any one of the minor automobile accidents in the claims identified in Exhibit "4" would present to Mazel Medical on or about the exact same dates after their accidents.

210.    It is even more improbable – to the point of impossibility – that the Insureds would all require x-rays or MRIs as the result of their common, minor accidents, or that they would be

all referred to Mazel Medical for x-rays or MRIs, and often for multiple x-rays or MRIs, on or about the exact same dates after their accidents.

211.    Even so, in keeping with the fact that the referrals from All Star and Merger to Mazel Medical were predicated on unlawful compensation, rather than medical necessity, All Star, Merger, Moleiro, and Herman routinely caused multiple Insureds, who had been involved in the same minor accident, to be referred from All Star and Merger to Mazel Medical for medically unwarranted x-rays and MRIs.

212.    For example:

(i)    On March 23, 2022, two Insureds – HL and EY were involved in the same automobile accident. Thereafter, both Insureds presented at All Star for initial examinations by Evora on March 24, 2022. At the conclusion of the initial examinations, All Star and Evora – at the direction of Moleiro, and in exchange for unlawful compensation from Mazel Medical and Diaz – referred both Insureds to Mazel Medical for medically unnecessary MRIs on the <u>exact same date</u>, March 24, 2022.

(ii)    On April 21, 2022, two Insureds – ID and IM were involved in the same automobile accident. Thereafter, both Insureds presented at All Star for initial examinations by Fernandez on April 22, 2022. At the conclusion of the initial examinations, Merger and Fernandez – at the direction of Moleiro, and in exchange for unlawful compensation from Mazel Medical and Diaz – referred both Insureds to Mazel Medical for medically unnecessary MRIs on the <u>exact same date</u>, April 22, 2022.

(iii)    On November 1, 2022, two Insureds – DB and GV were involved in the same automobile accident. Thereafter, both Insureds presented at Merger for initial examinations by Perez and Herman on November 3, 2022. At the conclusion of the initial examinations, Merger, Perez, and Herman – at the direction of Moleiro, and in exchange for unlawful compensation from Mazel Medical and Diaz – referred both Insureds to Mazel Medical for medically unnecessary MRIs on the <u>exact same date</u>, November 3, 2022.

(iv)    On November 26, 2022, two Insureds – MC and AQ – were involved in the same automobile accident. Thereafter, both Insureds presented at All Star for initial examinations by Franco on November 29, 2022. At the conclusion of the initial examinations, All Star and Franco – at the direction of Moleiro, and in exchange for unlawful compensation from Mazel Medical and Diaz – referred both Insureds to Mazel Medical for medically unnecessary x-rays on the <u>exact same date</u>, November 29, 2022.

(v)     On December 2, 2022, two Insureds – AL and AM were involved in the same automobile accident. Thereafter, both Insureds presented at Merger for initial examinations by Franco on December 5, 2022. At the conclusion of the initial examinations, Merger and Franco – at the direction of Moleiro, and in exchange for unlawful compensation from Mazel Medical and Diaz – referred both Insureds to Mazel Medical for medically unnecessary x-rays on the <u>exact same date</u>, December 5, 2022.

(vi)     On January 16, 2023, two Insureds – XN and NW – were involved in the same automobile accident. Thereafter, both Insureds presented at Merger for initial examinations by Perez on January 17, 2023. At the conclusion of the initial examinations, Merger and Perez – at the direction of Moleiro, and in exchange for unlawful compensation from Mazel Medical and Diaz – referred both Insureds to Mazel Medical for medically unnecessary x-rays on the <u>exact same date</u>, January 17, 2022.

(vii)     On January 19, 2023, three Insureds – JR, JV, and VD – were involved in the same automobile accident. Thereafter, all three Insureds presented at All star for initial examinations by Bonilla on January 19, 2023. At the conclusion of the initial examinations, All Star and Bonilla – at the direction of Moleiro, and in exchange for unlawful compensation from Mazel Medical and Diaz – referred all three Insureds to Mazel Medical for medically unnecessary x-rays on the <u>exact same date</u>, January 19, 2023.

(viii)     On February 15, 2023, two Insureds – WC and HC – were involved in the same automobile accident. Thereafter, both Insureds presented at All Star for initial examinations by Perez on February 22, 2023. At the conclusion of the initial examinations, All Star and Perez – at the direction of Moleiro, and in exchange for unlawful compensation from Mazel Medical and Diaz – referred both Insureds to Mazel Medical for medically unnecessary x-rays on the <u>exact same date</u>, February 22, 2023.

(ix)     On August 15, 2023, two Insureds – AM and UF– were involved in the same automobile accident. Thereafter, both Insureds presented at Merger for initial examinations by Perez and Herman on August 21, 2023. At the conclusion of the initial examinations, Merger, Perez, and Herman – at the direction of Moleiro, and in exchange for unlawful compensation from Mazel Medical and Diaz – referred both Insureds to Mazel Medical for medically unnecessary x-rays on the <u>exact same date</u>, August 21, 2023.

(x)     On September 5, 2023, three Insureds – PR, NR, and CR – were involved in the same automobile accident. Thereafter, both Insureds presented at All Star for initial examinations by Perez on September 5, 2023. At the conclusion of the initial examinations, All Star and Perez – at the direction of Moleiro, and in exchange for unlawful compensation from Mazel Medical and Diaz – referred both Insureds to

Maze Medical for medically unnecessary x-rays on the <u>exact same date</u>, September 5, 2023.

213.    These are only representative examples. In the claims identified in Exhibits "1" – "2", All Star, Merger, and Moleiro frequently caused two or more GEICO Insureds who had been involved in the same minor accident to be referred to Mazel Medical for medically unnecessary x-rays and MRIs, on or about the exact same dates after their common accidents.

214.    In this context, Herman who at all relevant times purported to be the medical director at All Star and Merger, never actually served as a legitimate medical director for All Star and Merger.

215.    Had Herman fulfilled his duties as medical director at All Star and Merger, he would have observed and put a stop to the Defendants' unlawful patient brokering scheme.

**6.    The Misrepresentations Regarding Zuazu's Performance or Direct Supervision of Fraudulent Services at Mazel Medical**

216.    In the claims identified in Exhibit "4", Mazel Medical, Delgado, Diaz, and Zuazu also routinely falsely represented that Zuazu had performed or directly supervised the pertinent x-ray and MRI services.

217.    The substantial majority of the HCFA-1500 forms/bills in the claims identified in Exhibit "4" included Zuazu's name in Box 31, and thereby represented that Zuazu had been physically present to perform, or at least directly supervise, the underlying x-ray and MRI services.

218.    In fact, Zuazu did not perform or directly supervise the Fraudulent Services in the claims identified in Exhibit "4".

219.    In keeping with the fact that Zuazu did not perform or directly supervise the services in the claims identified in Exhibit "4", Mazel Medical's March 2018 initial health care clinic license application and February 2020 health care clinic license renewal application – which

were submitted under penalty of perjury – represented that Zuazu was only present at Mazel Medical one day per month.

220.    What is more, Mazel Medical's March 2018 initial health care clinic license application and February 2020 health care clinic license renewal application represented that Zuazu did not himself perform any health care services on behalf of Mazel Medical.

221.    In fact, Zuazu, who was in his late 70s at the time, and who was simultaneously purporting to work at numerous health care practices and locations, could not have legitimately performed or directly supervised the Fraudulent Services in the claims identified in Exhibit "4".

222.    For example:

(i)     On March 21, 2022, Mazel Medical, Diaz, and Zuazu purported to provide at least eight individual MRIs and x-rays to at least four individual Insureds at Mazel Medical, and falsely contended in the resulting billing that Zuazu had personally performed or at least directly supervised every one of those MRIs and x-rays. That same day, Zuazu also purported to perform, or at least directly supervise: (a) at least 10 physical therapy services provided to one additional Insured at a clinic called Lighthouse Medical Group of FL; and (b) at least five individual x-rays provided to still another Insured at a clinic called Miami Imaging Corp.

(ii)    On June 8, 2022, Mazel Medical, Diaz, and Zuazu purported to provide at least 36 individual MRIs and x-rays to at least seven individual Insureds at Mazel Medical, and falsely contended in the resulting billing that Zuazu had personally performed or at least directly supervised every one of those MRIs and x-rays. That same day, Zuazu also purported to perform, or at least directly supervise: (a) at least 31 physical therapy services provided to three additional Insureds at a clinic called Lighthouse Medical Group of FL; and (b) at least three individual x-rays provided to still another Insured at a clinic called Millennium Radiology LLC.

(iii)   On August 23, 2022, Mazel Medical, Diaz, and Zuazu purported to provide at least 13 individual MRIs and x-rays to at least three individual Insureds at Mazel Medical, and falsely contended in the resulting billing that Zuazu had personally performed or at least directly supervised every one of those MRIs and x-rays. That same day, Zuazu also purported to perform, or at least directly supervise: (a) at least 23 physical therapy services provided to two additional Insureds at a clinic called Lighthouse Medical Group of FL; and (b) at least 10 individual x-rays provided to still another two Insureds at a clinic called Miami Imaging Corp.

(iv)  On October 19, 2022, Mazel Medical, Diaz, and Zuazu purported to provide to at least 49 individual x-rays to at least nine individual Insureds at Mazel Medical, and falsely contended in the resulting billing that Zuazu had personally performed or at least directly supervised every one of those x-rays. That same day, Zuazu also purported to perform, or at least directly supervise at least six physical therapy services provided to one additional Insured at a clinic called Family Evolution Mental Health.

(v)  On March 20, 2023, Mazel Medical, Diaz, and Zuazu purported to provide at least 15 individual x-rays to at least four individual Insureds at Mazel Medical, and falsely contended in the resulting billing that Zuazu had personally performed or at least directly supervised every one of those x-rays. That same day, Zuazu purported to perform, or at least directly supervise: (a) at least 10 physical therapy services provided to one additional Insured at a clinic called Moreno Rehab Center Inc; and (b) at least four individual MRIs provided to still another two Insureds at a clinic called Optimum Imaging LLC.

(vi)  On August 8, 2023, Mazel Medical, Diaz, and Zuazu purported to provide at least 41 individual x-rays to at least six individual Insureds at Mazel Medical, and falsely contended in the resulting billing that Zuazu had personally performed or at least directly supervised every one of those x-rays. That same day, Zuazu purported to perform, or at least directly supervise at least four individual MRIs and x-rays provided to still another three Insureds at two clinics called Optimum Imaging LLC and Family Care Rehab Group.

(vii)  On September 21, 2023, Mazel Medical, Diaz, and Zuazu purported to provide at least 40 individual x-rays to at least seven individual Insureds at Mazel Medical, and falsely contended in the resulting billing that Zuazu had personally performed, or at least directly supervised every one of those MRIs and x-rays. That same day, Zuazu also purported to personally perform, or at least directly supervise at least nine individual MRIs and x-rays provided to at least two additional Insureds at a clinic called Optimum Imaging LLC.

(viii)  On October 30, 2023, Mazel Medical, Diaz, and Zuazu purported to provide at least 22 individual MRIs and x-rays to at least five individual Insureds at Mazel Medical, and falsely contended in the resulting billing that Zuazu had personally performed, or at least directly supervised every one of those MRIs and x-rays. That same day, Zuazu also purported to personally perform, or at least directly supervise: (a) at least 12 physical therapy services provided to one additional Insured at a clinic called New World Medical & Rehab Inc.; and (b) at least three individual x-rays provided to still another Insured at a clinic called Miami Imaging Corp.

(ix)  On November 2, 2023, Mazel Medical, Diaz, and Zuazu purported to provide at least 35 individual MRIs and x-rays to at least seven individual Insureds at Mazel Medical, and falsely contended in the resulting billing that Zuazu had personally performed, or at least directly supervised every one of those MRIs and x-rays. That

same day, Zuazu also purported to personally perform, or at least directly supervise at least 13 physical therapy services provided to at least two additional Insureds at two clinics called New World Medical & Rehab Inc. and Luxury Therapy Medical Center.

    (x)    On August 2, 2024, Mazel Medical, Diaz, and Zuazu purported to provide at least 21 individual x-rays to at least four individual Insureds at Mazel Medical, and falsely contended in the resulting billing that Zuazu had personally performed, or at least directly supervised every one of those x-rays. That same day, Zuazu also purported to personally perform, or at least directly supervise at least: (a) at least six individual physical therapy services provided to at least one additional Insured at a clinic called MedSaludLLC; and (b) at least three individual MRIs provided to still another Insured at a clinic called Optimum Imaging LLC.

223.    These are only representative examples. In the claims identified in Exhibit "4", Mazel Medical, Delgado, Diaz, and Zuazu falsely represented that Zuazu had performed or directly supervised a large number of x-ray and MRI services on individual dates, typically at multiple locations, when in fact he had not.

224.    In this context, GEICO is only one of the automobile insurance companies doing business in the Florida automobile insurance market.

225.    It is extremely improbable, to the point of impossibility, that Mazel Medical, Delgado, Diaz, and Zuazu only submitted fraudulent billing to GEICO, and that Mazel Medical, Delgado, Diaz, and Zuazu did not simultaneously bill other automobile insurers.

226.    Thus, upon information and belief, the impossible number of x-rays of GEICO Insureds that Zuazu purported to perform or supervise at multiple locations on individual dates of service, including but not limited to dates of service identified above, constituted only a fraction of the total number of MRI and x-ray services that Zuazu purported to perform or supervise on those same dates of service.

227.   Zuazu – who purported to be the medical director at Mazel Medical – did not, and could not have, legitimately systematically reviewed Mazel Medical's billing to ensure that it was neither fraudulent nor unlawful.

228.   Had Zuazu actually systematically reviewed Mazel Medical's billing, he would have noted – among other things – that the billing falsely represented that he had performed or directly supervised an impossible volume of MRI and x-ray services on individual dates.

## III.   The Fraudulent and Unlawful Claims the Defendants Submitted or Caused to be Submitted to GEICO

229.   To support their fraudulent charges, Defendants systematically submitted or caused to be submitted thousands of bills and treatment reports through All Star, Merger, Luxen, and Mazel Medical to GEICO, containing thousands of individual charges, seeking payment for the Fraudulent Services for which Defendants were not entitled to receive payment.

230.   The claims that Defendants submitted or caused to be submitted to GEICO were false and misleading in the following, material respects:

(i)     The HCFA-1500 forms and treatment reports submitted or caused to be submitted by Defendants misrepresented to GEICO that Defendants were in compliance with Florida law and therefore were eligible to collect PIP Benefits in the first instance, when in fact they were not.

(ii)    The HCFA-1500 forms and treatment reports submitted or caused to be submitted by Defendants misrepresented to GEICO that the Fraudulent Services were lawfully provided, lawfully billed to GEICO, and eligible for PIP reimbursement, when in fact they were not.

(iii)   The HCFA-1500 forms and treatment reports submitted or caused to be submitted by Defendants misrepresented to GEICO that the Fraudulent Services were medically necessary and, in many cases, misrepresented to GEICO that the Fraudulent Services actually were performed. In fact, the Fraudulent Services frequently were not performed at all and, to the extent that they were performed, they were not medically necessary and were performed as part of a pre-determined fraudulent treatment and billing protocol designed solely to financially enrich Defendants, not to benefit the Insureds who supposedly were subjected to them.

(iv)   The HCFA-1500 forms reports submitted by and on behalf of Defendants frequently misrepresented and exaggerated the level of the Fraudulent Services and the nature of the Fraudulent Services that purportedly were provided.

## IV.   The Defendants' Fraudulent Concealment and GEICO's Justifiable Reliance

231.   Defendants were legally and ethically obligated to act honestly and with integrity in connection with their provision of the Fraudulent Services and their submission of charges to GEICO.

232.   To induce GEICO to promptly pay the fraudulent charges for the Fraudulent Services, Defendants systematically concealed their fraud and have gone to great lengths to accomplish this concealment.

233.   For instance, Defendants knowingly misrepresented and concealed facts in an effort to prevent discovery that Defendants operated in violation of Florida law and therefore were ineligible to collect PIP Benefits in the first instance.

234.   Defendants knowingly misrepresented and concealed facts in order to prevent GEICO from discovering that the Fraudulent Services were medically unnecessary, and frequently never were performed in the first instance.

235.   Defendants knowingly misrepresented and concealed facts in order to prevent GEICO from discovering that the Fraudulent Services were oftentimes unlawfully performed by massage therapists and unlicensed/unsupervised individuals, and unlawfully billed to GEICO.

236.   Defendants have hired law firms to pursue collection of the fraudulent charges for the Fraudulent Services from GEICO and other insurers if the charges were not promptly paid in full.

237.   GEICO is under statutory and contractual obligations to promptly and fairly process claims within 30 days. The facially-valid documents submitted to GEICO in support of the

fraudulent charges at issue, combined with the material misrepresentations and acts of concealment described above, were designed to and did cause GEICO to rely upon them. As a result, GEICO has incurred damages of more than $3,985,000.00.

238.     Based upon the Defendants' material misrepresentations and other affirmative acts to conceal their fraud from GEICO, GEICO did not discover and could not reasonably have discovered that its damages were attributable to fraud until shortly before it filed this Complaint.

## <u>FIRST CAUSE OF ACTION</u>
### Again All Star, Merger, Luxen, and Mazel Medical
### (Declaratory Judgment – 28 U.S.C. §§ 2201 and 2202)

239.     GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-238 above.

240.     There is an actual case and controversy between GEICO and All Star, Merger, Luxen, and Mazel Medical regarding more than $75,000.00 in pending fraudulent claims for the Fraudulent Services that have been submitted to GEICO.

241.     All Star, Merger, Luxen, and Mazel Medical have no right to receive payment for any pending bills submitted to GEICO because they unlawfully were operated in violation of Florida law.

242.     All Star, Merger, Luxen, and Mazel Medical have no right to receive payment for any pending bills submitted to GEICO because the underlying Fraudulent Services were not lawfully provided or billed to GEICO.

243.     All Star, Merger, Luxen, and Mazel Medical have no right to receive payment for any pending bills submitted to GEICO because the underlying Fraudulent Services were not medically necessary and were provided – to the extent that they were provided at all – pursuant to

pre-determined fraudulent protocols designed solely to financially enrich Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them.

244.    All Star, Merger, Luxen, and Mazel Medical have no right to receive payment for any pending bills submitted to GEICO because the billing for the underlying Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges submitted to GEICO.

245.    Accordingly, GEICO requests a judgment pursuant to the Declaratory Judgment, 28 U.S.C. §§ 2201 and 2202, declaring that All Star, Merger, Luxen, and Mazel Medical have no right to receive payment for any pending bills submitted to GEICO.

### SECOND CAUSE OF ACTION
**Against Moleiro**
**(Violation of RICO, 18 U.S.C. § 1962(c))**

246.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-238 above.

247.    All Star is an ongoing "enterprise", as that term is defined in 19 U.S.C. § 1961(4), that engages in activities that affected interstate commerce.

248.    Moleiro knowingly conducted and/or participated, directly or indirectly, in the conduct of All Star's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted thousands of fraudulent charges on a continuous basis for over three years seeking payments that All Star was not eligible to receive under the No-Fault Law because: (i) All Star unlawfully was operated in violation of Florida law; (ii) the underlying Fraudulent Services were not lawfully provided or billed to GEICO; (iii) the underlying Fraudulent Services were not medically necessary and were provided – to the extent that they were

provided at all – pursuant to pre-determined fraudulent protocols designed solely to financially enrich Defendants rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them; (iv) in many cases, the Fraudulent Services never were provided in the first instance; and (v) the billing codes used for the underlying Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges submitted to GEICO. A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "1".

249.    All Star's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitted fraudulent charges to insurers. The predicate acts of mail fraud are the regular way in which Moleiro operated All Star, inasmuch as All Star was not engaged in legitimate health care practice, and acts of mail fraud therefore were essential in order for All Star to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a threat of continued criminal activity, as does the fact that All Star continues to attempt collection on the fraudulent billing for the Fraudulent Services to the present day.

250.    All Star is engaged in inherently unlawful acts, inasmuch as it continues to submit and attempt collection on fraudulent billing submitted to GEICO and other insurers. These inherently unlawful acts are taken by All Star in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent no-fault billing.

251.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $1,095,000.00 pursuant to the fraudulent bills submitted through the All Star enterprise.

252.     By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper.

**THIRD CAUSE OF ACTION**
**Against Moleiro, Joseph, and Herman**
**(Violation of RICO, 18 U.S.C. § 1962(d))**

253.     GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-238 above.

254.     All Star is an ongoing "enterprise" as that term is defined in 18 U.S.C. § 1961(4), that engages in activities that affected interstate commerce.

255.     Moleiro, Joseph, and Herman were employed by or associated with the All Star enterprise.

256.     Moleiro, Joseph, and Herman knowingly have agreed, combined and conspired to conduct and/or participate, directly or indirectly, in the conduct of All Star's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted thousands of fraudulent charges on a continuous basis for over three years seeking payments that All Star was not eligible to receive under the No-Fault Law because: (i) All Star unlawfully was operated in violation of Florida law; (ii) the underlying Fraudulent Services were not lawfully provided or billed to GEICO; (iii) the underlying Fraudulent Services were not medically necessary and were provided – to the extent that they were provided at all – pursuant to pre-determined fraudulent protocols designed solely to financially enrich Defendants rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them; (iv) in many cases, the Fraudulent Services never were provided in the first instance; and (v) the billing codes used for the underlying

Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges submitted to GEICO. A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "1". Each such mailing was made in furtherance of the mail fraud scheme.

257.    Moleiro, Joseph, and Herman knew of, agreed to and acted in furtherance of the common and overall objective (i.e., to defraud GEICO and other automobile insurers of money) by submitting or facilitating the submission of the fraudulent charges to GEICO.

258.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $1,095,000.00 pursuant to the fraudulent bills submitted through the All Star enterprise.

259.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

## FOURTH CAUSE OF ACTION
### Against All Star, Moleiro, Joseph, and Herman
### (Under Fla. Stat. 501.201 et. seq.)

260.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-238 above.

261.    All Star, Moleiro, Joseph, and Herman engaged in unfair, deceptive, and unconscionable acts or trade practices in their trade or commerce in the pursuit and execution of their scheme to illegally obtain PIP Benefits from GEICO.

262.     The bills and supporting documents submitted or caused to be submitted by All Star, Moleiro, Joseph, and Herman to GEICO were fraudulent in that they misrepresented: (i) All Star's eligibility to collect PIP Benefits in the first instance; (ii) that the Fraudulent Services were lawfully provided and billed to GEICO; (iii) that the Fraudulent Services were medically necessary; and (iv) that the Fraudulent Services actually were performed in the first instance.

263.     Such acts and practices offend public policy and are immoral, unethical, oppressive, and unscrupulous. Additionally, the conduct of All Star, Moleiro, Joseph, and Herman has been materially injurious to GEICO and its Insureds.

264.     The conduct of All Star, Moleiro, Joseph, and Herman was the actual and proximate cause of the damages sustained by GEICO.

265.     All Star, Moleiro, Joseph, and Herman's unfair and deceptive acts have caused GEICO to sustain damages of at least $1,095,000.00.

266.     By reason of All Star, Moleiro, Joseph, and Herman's conduct, GEICO is also entitled to recover costs and reasonable attorneys' fees pursuant to Fla. Stat. 501.211(2).

### FIFTH CAUSE OF ACTION
**Against All Star, Moleiro, Joseph, and Herman**
**(Common Law Fraud)**

267.     GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-238 above.

268.     All Star, Moleiro, Joseph, and Herman intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of their submission of thousands of fraudulent bills through All Star for the Fraudulent Services.

269.     The false and fraudulent of material fact and acts of fraudulent concealment include: (i) in every claim, the representation that that All Star was in compliance with Florida law, and eligible to collect PIP Benefits in the first instance, when in fact it was not; (ii) in every claim, the representation that the Fraudulent Services were lawfully provided, lawfully billed to GEICO, and eligible for PIP reimbursement, when in fact the Fraudulent Services were not lawfully provided, were not lawfully billed to GEICO, and were not eligible for PIP reimbursement; (iii) in every claim, the representation that the Fraudulent Services were medically necessary, when in fact they were not medically necessary; and (iv) in many claims, the representation that the Fraudulent Services actually were performed, when in many cases they were not actually performed. All Star, Moleiro, Joseph, and Herman intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through All Star that were not reimbursable.

270.     GEICO justifiably relied on these false and fraudulent representations and acts of fraudulent concealment, and as a proximate result has been injured in its business and property by reason of the above-described conduct in that it has paid at least $1,095,000.00 pursuant to the fraudulent bills that were submitted or caused to be submitted by All Star, Moleiro, Joseph, and Herman through Advanced Human Care.

271.     All Star, Moleiro, Joseph, and Herman's extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

272.     Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

**SIXTH CAUSE OF ACTION**
**Against All Star, Moleiro, Joseph, and Herman**
**(Unjust Enrichment)**

273.     GEICO incorporates, as fully set forth herein, each and every allegation in paragraphs 1-238 above.

274.     As set forth above, All Star, Moleiro, Joseph, and Herman have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

275.     When GEICO paid the bills and charges submitted or caused to be submitted by All Star, Moleiro, Joseph, and Herman through All Star, it reasonably believed that it was legally obligated to make such payments based on All Star, Moleiro, Joseph, and Herman's improper, unlawful, and/or unjust acts.

276.     All Star, Moleiro, Joseph, and Herman have been enriched at GEICO's expense by GEICO's payments which constituted a benefit that All Star, Moleiro, Joseph, and Herman voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

277.     All Star, Moleiro, Joseph, and Herman's retention of GEICO's payments violates fundamental principles of justice, equity and good conscience.

278.     By reason of the above, All Star, Moleiro, Joseph, and Herman have been unjustly enriched in an amount to be determined at trial, but in no event less than $1,095,000.00.

**SEVENTH CAUSE OF ACTION**
**Against Moleiro**
**(Violation of RICO, 18 U.S.C. § 1962(c))**

279.     GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-238 above.

280.     Merger is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engages in activities that affect interstate commerce.

281.     Moleiro knowingly has conducted and/or participated, directly or indirectly, in the conduct of Merger's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted thousands of fraudulent charges on a continuous basis for over four years seeking payments that Merger was not eligible to receive under the No-Fault Law because: (i) Merger unlawfully was operated in violation of Florida law; (ii) the underlying Fraudulent Services were not lawfully provided or billed to GEICO; (iii) the underlying Fraudulent Services were not medically necessary and were provided – to the extent that they were provided at all – pursuant to pre-determined fraudulent protocols designed solely to financially enrich Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them; (iv) in many cases, the Fraudulent Services never were provided in the first instance; and (v) the billing codes used for the underlying Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges submitted to GEICO.

282.     A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "2".

283.     Merger's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular way in which Moleiro operated Merger, inasmuch as Merger was not engaged in a legitimate health care practice, and acts of mail fraud therefore were essential in order for Merger to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts

of mail fraud implies a threat of continued criminal activity, as does the fact that Merger continues to attempt collection on the fraudulent billing submitted through Merger to the present day.

284.    Merger is engaged in inherently unlawful acts, inasmuch as it continues to submit and attempt collection on fraudulent billing submitted to GEICO and other insurers. These inherently unlawful acts are taken by Merger in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent no-fault billing.

285.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $970,000.00 pursuant to the fraudulent bills submitted through Merger.

286.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper.

**EIGHTH CAUSE OF ACTION**
**Against Moleiro, Jorge, and Herman**
**(Violation of RICO, 18 U.S.C. § 1962(d))**

287.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-238 above.

288.    Merger is an ongoing "enterprise," as that term is defined in 18 U.S.C. § 1961(4), that engages in activities that affected interstate commerce.

289.    Moleiro, Jorge, and Herman were employed by or associated with the Merger enterprise.

290.    Moleiro, Jorge, and Herman knowingly have agreed, combined and conspired to conduct and/or participate, directly or indirectly, in the conduct of Merger's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C.

§ 1341, based upon the use of the United States mails to submit or cause to be submitted thousands of fraudulent charges on a continuous basis for over four years seeking payments that Merger was not eligible to receive under the No-Fault Law because: (i) Merger unlawfully was operated in violation of Florida law; (ii) the underlying Fraudulent Services were not lawfully provided or billed to GEICO; (iii) the underlying Fraudulent Services were not medically necessary and were provided – to the extent that they were provided at all – pursuant to pre-determined fraudulent protocols designed solely to financially enrich Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them; (iv) in many cases, the Fraudulent Services never were provided in the first instance; and (v) the billing codes used for the underlying Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges submitted to GEICO.

291.    A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "2". Each such mailing was made in furtherance of the mail fraud scheme.

292.    Moleiro, Jorge, and Herman knew of, agreed to and acted in furtherance of the common and overall objective (i.e., to defraud GEICO and other automobile insurers of money) by submitting or facilitating the submission of the fraudulent charges to GEICO.

293.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $970,000.00 pursuant to the fraudulent bills submitted through the Merger enterprise.

294.     By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

### NINTH CAUSE OF ACTION
**Against Merger, Moleiro, Jorge, and Herman**
**(Under Fla. Stat. 501.201 et. seq.)**

295.     GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-238 above.

296.     Merger, Moleiro, Jorge, and Herman are actively engaged in trade and commerce in the State of Florida.

297.     GEICO and its Insureds are "consumers" as defined by Fla. Stat. 501.203.

298.     Merger, Moleiro, Jorge, and Herman engaged in unfair, deceptive, and unconscionable acts or trade practices in their trade or commerce in the pursuit and execution of their scheme to illegally-obtain PIP Benefits from GEICO.

299.     The bills and supporting documents submitted by Merger, Moleiro, Jorge, and Herman to GEICO in connection with the Fraudulent Services were fraudulent in that they misrepresented: (i) Merger's eligibility to collect PIP Benefits in the first instance; (ii) that the Fraudulent Services were lawfully provided and billed to GEICO; (iii) that the Fraudulent Services were medically necessary; and (iv) that the Fraudulent Services actually were performed in the first instance.

300.     Such acts and practices offend public policy and are immoral, unethical, oppressive, and unscrupulous. Additionally, the conduct of Merger, Moleiro, Jorge, and Herman has been materially injurious to GEICO and its Insureds.

301.     The conduct of Merger, Moleiro, Jorge, and Herman was the actual and proximate cause of the damages sustained by GEICO.

302.     Merger, Moleiro, Jorge, and Herman's unfair and deceptive acts have caused GEICO to sustain damages of at least $970,000.00.

303.     By reason of Merger, Moleiro, Jorge, and Herman's conduct, GEICO is also entitled to recover costs, and reasonable attorneys' fees pursuant to Fla. Stat. 501.211(2).

**TENTH CAUSE OF ACTION**
**Against Merger, Moleiro, Jorge, and Herman**
**(Common Law Fraud)**

304.     GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-238 above.

305.     Merger, Moleiro, Jorge, and Herman intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of their submission of thousands of fraudulent bills through Merger for the Fraudulent Services.

306.     The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, the representation that Merger was in compliance with Florida law, and eligible to collect PIP Benefits in the first instance, when in fact it was not; (ii) in every claim, the representation that the Fraudulent Services were lawfully provided, lawfully billed to GEICO, and eligible for PIP reimbursement, when in fact the Fraudulent Services were not lawfully provided, were not lawfully billed to GEICO, and were not eligible for PIP reimbursement; (iii) in every claim, the representation that the Fraudulent Services were medically necessary, when in fact they were not medically necessary; and (iv) in many claims, the representation that the Fraudulent Services actually were performed, when in many cases they were not actually performed. Merger, Moleiro, Jorge, and Herman intentionally made the above-

described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through Merger that were not reimbursable.

307.    GEICO justifiably relied on these false and fraudulent representations and acts of fraudulent concealment, and as a proximate result has been injured in its business and property by reason of the above-described conduct in that it has paid at least $970,000.00 pursuant to the fraudulent bills that were submitted or caused to be submitted Merger, Moleiro, Jorge, and Herman through Merger.

308.    Merger, Moleiro, Jorge, and Herman's extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

309.    Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

## ELEVENTH CAUSE OF ACTION
### Against Merger, Moleiro, Jorge, and Herman
### (Unjust Enrichment)

310.    GEICO incorporates, as fully set forth herein, each and every allegation in paragraphs 1-238 above.

311.    As set forth above, Merger, Moleiro, Jorge, and Herman have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

312.    When GEICO paid the bills and charges submitted or caused to be submitted by Merger, Moleiro, Jorge, and Herman through Merger it reasonably believed that it was legally obligated to make such payments based on Merger, Moleiro, Jorge, and Herman's improper, unlawful, and/or unjust acts.

313.     Merger, Moleiro, Jorge, and Herman have been enriched at GEICO's expense by GEICO's payments which constituted a benefit that Merger, Moleiro, Jorge, and Herman voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

314.     Merger, Moleiro, Jorge, and Herman's retention of GEICO's payments violates fundamental principles of justice, equity and good conscience.

315.     By reason of the above, Merger, Moleiro, Jorge, and Herman have been unjustly enriched in an amount to be determined at trial, but in no event less than $970,000.00.

**TWELFTH CAUSE OF ACTION**
**Against Moleiro**
**(Violation of RICO, 18 U.S.C. § 1962(c))**

316.     GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-238, above.

317.     Luxen is an ongoing "enterprise," as that term is defined in 18 U.S.C. § 1961(4), that engages in activities that affect interstate commerce.

318.     Moleiro knowingly conducted and/or participated, directly or indirectly, in the conduct of Luxen's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted thousands of fraudulent charges on a continuous basis for over two years seeking payments that Luxen was not eligible to receive under the No-Fault Law because: (i) Luxen unlawfully was operated in violation of Florida law; (ii) the underlying Fraudulent Services were not lawfully provided or billed to GEICO; and (iii) the underlying Fraudulent Services were not medically necessary and were provided – to the extent that they were provided at all – pursuant to pre-determined fraudulent protocols designed solely to financially enrich Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them.

319.     A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "3".

320.     Luxen's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular way in which Moleiro operated Luxen, inasmuch as Luxen was not engaged in a legitimate health care practice, and acts of mail fraud therefore were essential in order for Luxen to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a threat of continued criminal activity, as does the fact that Luxen continues to attempt collection on the fraudulent billing submitted through Luxen to the present day.

321.     Luxen is engaged in inherently unlawful acts, inasmuch as it continues to submit and attempt collection on fraudulent billing submitted to GEICO and other insurers. These inherently unlawful acts are taken by Luxen in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent no-fault billing.

322.     GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $370,000.00 pursuant to the fraudulent bills submitted through Luxen.

323.     By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper.

## THIRTEENTH CAUSE OF ACTION
### Against Moleiro and Herman
### (Violation of RICO, 18 U.S.C. § 1962(d))

324.     GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-238 above.

325.     Luxen is an ongoing "enterprise," as that term is defined in 18 U.S.C. § 1961(4), that engages in activities that affected interstate commerce.

326.     Moleiro and Herman were employed by or associated with the Luxen enterprise.

327.     Moleiro and Herman knowingly agreed, combined and conspired to conduct and/or participate, directly or indirectly, in the conduct of Luxen's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted thousands of fraudulent charges on a continuous basis for over two years seeking payments that Luxen was not eligible to receive under the No-Fault Law because: (i) Luxen unlawfully was operated in violation of Florida law; (ii) the underlying Fraudulent Services were not lawfully provided or billed to GEICO; and (iii) the underlying Fraudulent Services were not medically necessary and were provided – to the extent that they were provided at all – pursuant to pre-determined fraudulent protocols designed solely to financially enrich Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them.

328.     A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "3". Each such mailing was made in furtherance of the mail fraud scheme.

329.     Moleiro and Herman knew of, agreed to and acted in furtherance of the common and overall objective (i.e., to defraud GEICO and other automobile insurers of money) by submitting or facilitating the submission of the fraudulent charges to GEICO.

330.     GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $370,000.00 pursuant to the fraudulent bills submitted through the Luxen enterprise.

331.     By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

## FOURTEENTH CAUSE OF ACTION
### Against Luxen, Moleiro, and Herman
### (Under Fla. Stat. 501.201 et. seq.)

332.     GEICO incorporates, as fully set forth herein, each and every allegation in paragraphs 1-238 above.

333.     Luxen, Moleiro, and Herman are actively engaged in trade and commerce in the State of Florida.

334.     GEICO and its Insureds are "consumers" as defined by Fla. Stat. 501.203.

335.     Luxen, Moleiro, and Herman engaged in unfair, deceptive, and unconscionable acts or trade practices in their trade or commerce in the pursuit and execution of their scheme to illegally obtain PIP Benefits from GEICO.

336.     The bills and supporting documents submitted by Luxen, Moleiro, and Herman to GEICO in connection with the Fraudulent Services were fraudulent in that they misrepresented: (i) Luxen's eligibility to collect PIP Benefits in the first instance; (ii) that the Fraudulent Services were lawfully provided; and (iii) that the Fraudulent Services were medically necessary.

337.    Such acts and practices offend public policy and are immoral, unethical, oppressive, and unscrupulous. Additionally, the conduct of Luxen, Moleiro, and Herman has been materially injurious to GEICO and its Insureds.

338.    The conduct of Luxen, Moleiro, and Herman was the actual and proximate cause of the damages sustained by GEICO.

339.    Luxen, Moleiro, and Herman's unfair and deceptive acts have caused GEICO to sustain damages of at least $370,000.00.

340.    By reason of Luxen, Moleiro, and Herman's conduct, GEICO is also entitled to recover costs, and reasonable attorneys' fees pursuant to Fla. Stat. 501.211(2).

## FIFTEENTH CAUSE OF ACTION
### Against Luxen, Moleiro, and Herman
### (Common Law Fraud)

341.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-238 above.

342.    Luxen, Moleiro, and Herman intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of their submission of thousands of fraudulent bills through Luxen for the Fraudulent Services.

343.    The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, the representation that Luxen was in compliance with Florida law, and eligible to collect PIP Benefits in the first instance, when in fact it was not; (ii) in every claim, the representation that the Fraudulent Services were lawfully provided, lawfully billed to GEICO, and eligible for PIP reimbursement, when in fact the Fraudulent Services were not lawfully provided, were not lawfully billed to GEICO, and were not eligible for PIP

reimbursement; and (iii) in every claim, the representation that the Fraudulent Services were medically necessary, when in fact they were not medically necessary.

344.    Luxen, Moleiro, and Herman intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through New Vista that were not reimbursable.

345.    GEICO justifiably relied on these false and fraudulent representations and acts of fraudulent concealment, and as a proximate result has been injured in its business and property by reason of the above-described conduct in that it has paid at least $370,000.00 pursuant to the fraudulent bills that were submitted or caused to be submitted by Luxen, Moleiro, and Herman through Luxen.

346.    Luxen, Moleiro, and Herman's extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

347.    Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

### SIXTEENTH CAUSE OF ACTION
**Against Luxen, Moleiro, and Herman**
**(Unjust Enrichment)**

348.    GEICO incorporates, as fully set forth herein, each and every allegation in paragraphs 1-238 above.

349.    As set forth above, Luxen, Moleiro, and Herman have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

350.    When GEICO paid the bills and charges submitted or caused to be submitted by Luxen, Moleiro, and Herman through Luxen it reasonably believed that it was legally obligated to

make such payments based on Luxen, Moleiro, and Herman's improper, unlawful, and/or unjust acts.

351.    Luxen, Moleiro, and Herman have been enriched at GEICO's expense by GEICO's payments which constituted a benefit that Luxen, Moleiro, and Herman voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

352.    Luxen, Moleiro, and Herman's retention of GEICO's payments violates fundamental principles of justice, equity and good conscience.

353.    By reason of the above, Luxen, Moleiro, and Herman have been unjustly enriched in an amount to be determined at trial, but in no event less than $370,000.00.

**SEVENTEENTH CAUSE OF ACTION**
**Against Delgado and Diaz**
**(Violation of RICO, 18 U.S.C. § 1962(c))**

354.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-238 above.

355.    Mazel Medical is an ongoing "enterprise," as that term is defined in 18 U.S.C. § 1961(4), that engages in activities that affect interstate commerce.

356.    Delgado and Diaz knowingly conducted and/or participated, directly or indirectly, in the conduct of Mazel Medical's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted thousands of fraudulent charges on a continuous basis for over four years seeking payments that Mazel Medical was not eligible to receive under the No-Fault Law because: (i) Mazel Medical unlawfully was operated in violation of Florida law; (ii) the underlying Fraudulent Services were not lawfully provided or billed to GEICO; and (iii) the underlying Fraudulent Services were not medically necessary and were provided – to the extent that they were provided at all – pursuant to pre-determined fraudulent

protocols designed solely to financially enrich Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them.

357.    A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "4".

358.    Mazel Medical's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular way in which Delgado and Diaz operated Mazel Medical, inasmuch as Mazel Medical was not engaged in a legitimate health care practice, and acts of mail fraud therefore were essential in order for Mazel Medical to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a threat of continued criminal activity, as does the fact that Mazel Medical continues to attempt collection on the fraudulent billing submitted through Mazel Medical to the present day.

359.    Mazel Medical is engaged in inherently unlawful acts, inasmuch as it continues to submit and attempt collection on fraudulent billing submitted to GEICO and other insurers. These inherently unlawful acts are taken by Mazel Medical in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent no-fault billing.

360.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $1,550,000.00 pursuant to the fraudulent bills submitted through Mazel Medical.

361.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper.

## EIGHTEENTH CAUSE OF ACTION
### Against **Delgado, Diaz, and Zuazu**
### (Violation of RICO, 18 U.S.C. § 1962(d))

362.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-238 above.

363.    Mazel Medical is an ongoing "enterprise," as that term is defined in 18 U.S.C. § 1961(4), that engages in activities that affected interstate commerce.

364.    Delgado, Diaz, and Zuazu were employed by or associated with the Mazel Medical enterprise.

365.    Delgado, Diaz, and Zuazu knowingly agreed, combined and conspired to conduct and/or participate, directly or indirectly, in the conduct of Mazel Medical's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted thousands of fraudulent charges on a continuous basis for over four years seeking payments that Mazel Medical was not eligible to receive under the No-Fault Law because: (i) Mazel Medical unlawfully was operated in violation of Florida law; (ii) the underlying Fraudulent Services were not lawfully provided or billed to GEICO; and (iii) the underlying Fraudulent Services were not medically necessary and were provided – to the extent that they were provided at all – pursuant to pre-determined fraudulent protocols designed solely to financially enrich Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them.

366.    A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "4". Each such mailing was made in furtherance of the mail fraud scheme.

367.     Delgado, Diaz, and Zuazu knew of, agreed to and acted in furtherance of the common and overall objective (i.e., to defraud GEICO and other automobile insurers of money) by submitting or facilitating the submission of the fraudulent charges to GEICO.

368.     GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $1,550,000.00 pursuant to the fraudulent bills submitted through the Mazel Medical enterprise.

369.     By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

### NINETEENTH CAUSE OF ACTION
**Against Mazel Medical, Delgado, Diaz, and Zuazu**
**(Under Fla. Stat. 501.201 et. seq.)**

370.     GEICO incorporates, as fully set forth herein, each and every allegation in paragraphs 1-238 above.

371.     Mazel Medical, Delgado, Diaz, and Zuazu are actively engaged in trade and commerce in the State of Florida.

372.     GEICO and its Insureds are "consumers" as defined by Fla. Stat. 501.203.

373.     Mazel Medical, Delgado, Diaz, and Zuazu engaged in unfair, deceptive, and unconscionable acts or trade practices in their trade or commerce in the pursuit and execution of their scheme to illegally-obtain PIP Benefits from GEICO.

374.     The bills and supporting documents submitted by Mazel Medical, Delgado, Diaz, and Zuazu to GEICO in connection with the Fraudulent Services were fraudulent in that they misrepresented: (i) Mazel Medical's eligibility to collect PIP Benefits in the first instance; (ii) that

the Fraudulent Services were lawfully provided; and (iii) that the Fraudulent Services were medically necessary.

375.    Such acts and practices offend public policy and are immoral, unethical, oppressive, and unscrupulous.  Additionally, the conduct of Mazel, Medical, Delgado, Diaz, and Zuazu has been materially injurious to GEICO and its Insureds.

376.    The conduct of Mazel Medical, Delgado, Diaz, and Zuazu was the actual and proximate cause of the damages sustained by GEICO.

377.    Mazel Medical, Delgado, Diaz, and Zuazu's unfair and deceptive acts have caused GEICO to sustain damages of at least $1,550,000.00.

378.    By reason of Mazel Medical, Delgado, Diaz, and Zuazu, GEICO is also entitled to recover costs, and reasonable attorneys' fees pursuant to Fla. Stat. 501.211(2).

## TWENTIETH CAUSE OF ACTION
### Against Mazel Medical, Delgado, Diaz, and Zuazu
### (Common Law Fraud)

379.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-238 above.

380.    Mazel Medical, Delgado, Diaz, and Zuazu intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of their submission of thousands of fraudulent bills through Mazel Medical for the Fraudulent Services.

381.    The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, the representation that Mazel medical was in compliance with Florida law, and eligible to collect PIP Benefits in the first instance, when in fact it was not; (ii) in every claim, the representation that the Fraudulent Services were lawfully provided, lawfully

billed to GEICO, and eligible for PIP reimbursement, when in fact the Fraudulent Services were not lawfully provided, were not lawfully billed to GEICO, and were not eligible for PIP reimbursement; and (iii) in every claim, the representation that the Fraudulent Services were medically necessary, when in fact they were not medically necessary.

382.     Mazel Medical, Delgado, Diaz, and Zuazu intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through Mazel Medical that were not reimbursable.

383.     GEICO justifiably relied on these false and fraudulent representations and acts of fraudulent concealment, and as a proximate result has been injured in its business and property by reason of the above-described conduct in that it has paid at least $1,550,000.00 pursuant to the fraudulent bills that were submitted or caused to be submitted by Mazel Medical, Delgado, Diaz, and Zuazu through Mazel Medical.

384.     Mazel Medical, Delgado, Diaz, and Zuazu's extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

385.     Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

**TWENTY-FIRST CAUSE OF ACTION**
**Against Mazel Medical, Delgado, Diaz, and Zuazu**
**(Unjust Enrichment)**

386.     GEICO incorporates, as fully set forth herein, each and every allegation in paragraphs 1-238 above.

104

387.    As set forth above, Mazel Medical, Delgado, Diaz, and Zuazu have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

388.    When GEICO paid the bills and charges submitted or caused to be submitted by Mazel Medical, Delgado, Diaz, and Zuazu through Mazel Medical it reasonably believed that it was legally obligated to make such payments based on Mazel Medical, Delgado, Diaz, and Zuazu's improper, unlawful, and/or unjust acts.

389.    Mazel Medical, Delgado, Diaz, and Zuazu have been enriched at GEICO's expense by GEICO's payments which constituted a benefit that Mazel Medical, Delgado, Diaz, and Zuazu voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

390.    Mazel Medical, Delgado, Diaz, and Zuazu's retention of GEICO's payments violates fundamental principles of justice, equity and good conscience.

391.    By reason of the above, Mazel Medical, Delgado, Diaz, and Zuazu have been unjustly enriched in an amount to be determined at trial, but in no event less than $1,550,000.00.

## **JURY DEMAND**

392.    Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury.

**WHEREFORE**, Plaintiffs Government Employees Insurance Co., GEICO Indemnity Co., GEICO General Insurance Company and GEICO Casualty Co. demand that a Judgment be entered in their favor:

A.    On the First Cause of Action against All Star, Merger, Luxen, and Mazel Medical, a declaration pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, that All Star, Merger, Luxen, and Mazel Medical have no right to receive payment for any pending bills submitted to GEICO;

B.      On the Second Cause of Action against Moleiro, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $1,095,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

C.      On the Third Cause of Action against Moleiro, Joseph, and Herman, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $1,095,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

D.      On the Fourth Cause of Action against All Star, Moleiro, Joseph, and Herman, compensatory damages in an amount to be determined at trial but in excess of $1,095,000.00, together with costs and reasonable attorneys' fees pursuant to Fla. Stat. 501.211(2);

E.      On the Fifth Cause of Action against All Star, Moleiro, Joseph, and Herman, compensatory damages in an amount to be determined at trial but in excess of $1,095,000.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

F.      On the Sixth Cause of Action against All Star, Moleiro, Joseph, and Herman, more than $1,095,000.00 in compensatory damages, plus costs and interest and such other and further relief as this Court deems just and proper.

G.      On the Seventh Cause of Action against Moleiro, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $970,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

H.      On the Eighth Cause of Action against Moleiro, Jorge, and Herman, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess $970,000.00,

together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

I.      On the Ninth Cause of Action against Merger, Moleiro, Jorge, and Herman, compensatory damages in an amount to be determined at trial but in excess of $970,000.00, together with costs and reasonable attorneys' fees pursuant to Fla. Stat. 501.211(2);

J.      On the Tenth Cause of Action against Merger, Moleiro, Jorge, and Herman, compensatory damages in an amount to be determined at trial but in excess of $970,000.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

K.      On the Eleventh Cause of Action against Merger, Moleiro, Jorge, and Herman, more than $970,000.00 in compensatory damages, plus costs and interest and such other and further relief as this Court deems just and proper.

L.      On the Twelfth Cause of Action against Moleiro, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $370,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

M.      On the Thirteenth Cause of Action against Moleiro and Herman, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $370,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

N.      On the Fourteenth Cause of Action against Luxen, Moleiro, and Herman, compensatory damages in an amount to be determined at trial but in excess of $370,000.00, together with costs and reasonable attorneys' fees pursuant to Fla. Stat. 501.211(2);

O.      On the Fifteenth Cause of Action against Luxen, Moleiro, and Herman, compensatory damages in an amount to be determined at trial but in excess of $370,000.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

P.      On the Sixteenth Cause of Action against Luxen, Moleiro, and Herman, more than $370,000.00 in compensatory damages, plus costs and interest and such other and further relief as this Court deems just and proper;

Q.      On the Seventeenth Cause of Action against Delgado and Diaz, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $1,500,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

R.      On the Eighteenth Cause of Action against Delgado, Diaz, and Zuazu, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $1,500,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

S.      On the Nineteenth Cause of Action against Mazel Medical, Delgado, Diaz, and Zuazu, compensatory damages in an amount to be determined at trial but in excess of $1,500,000.00, together with costs and reasonable attorneys' fees pursuant to Fla. Stat. 501.211(2);

T.      On the Twentieth Cause of Action against Mazel Medical, Delgado, Diaz, and Zuazu, compensatory damages in an amount to be determined at trial but in excess of $1,500,000.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

U.      On the Twenty-First Cause of Action against Mazel Medical, Delgado, Diaz, and Zuazu, more than $1,500,000.00 in compensatory damages, plus costs and interest and such other and further relief as this Court deems just and proper.

Dated:          February 24, 2025

>                          */s/ Kristen L. Wenger*
>                          Max Gershenoff (FBN 1038855)
>                          John P. Marino (FBN 814539)
>                          Kristen L. Wenger (FBN 92136)
>                          Lindsey R. Trowell (FBN 678783)
>                          RIVKIN RADLER, LLP
>                          Riverplace Tower
>                          1301 Riverplace Blvd.
>                          Suite 1000
>                          Jacksonville, FL 32207
>                          Phone:  (904) 791-8948
>                          Facsimile:  (904) 598-6225
>                          Max.Gershenoff@rivkin.com
>                          John.Marino@rivkin.com
>                          Kristen.Wenger@rivkin.com
>                          Lindsey.Trowell@rivkin.com
>                          *Counsel for Plaintiffs*